COLLIER *v.* STEBBINS.

1. CONTRACTS—PRELIMINARY TALK MERGED IN WRITING.
    Preliminary talk was presumptively merged in the written contract.[1]

2. FRAUD—EVIDENCE—SUFFICIENCY—DIRECTED VERDICT.
    In an action on a written contract for advertising for 60 months, defended on the ground of fraud in that defend, ant claims he thought he was signing a contract for only one year, where the evidence shows that defendant was an educated man with many years of business experience, that he had ample opportunity to read the contract and inform himself of its terms, but claims to have failed to do so, and there was no proof of any fraudulent reading or misstatement as to its contents, a verdict should have been directed for plaintiff.[2]

Error to Ingham; Carr (Leland W.), J.     Submitted January 13, 1926.     (Docket No. 120.)     Decided October 4, 1926.

Assumpsit by Barron G. Collier, Incorporated, against Francis B. Stebbins, doing business as Riker's Dry Cleaning and Dye Works, on an advertising contract.     Judgment for defendant.     Plaintiff brings error.     Reversed.

*Brown & Kelley* and *Duane H. Mosier*, for appellant.

*Reynolds, Pierce & Planck*, for appellee.

STEERE, J.     Plaintiff is a New York corporation with its office and principal place of business in the city of New York.     It is and has been for the past 25 years or more engaged in car card advertising in cities throughout the United States by posting in street cars display cards with advertising matter of

[1]Contracts, 13 C. J. § 616; [2]Id., 13 C. J. §§ 249, 250; 6 R. C. L. 624; 4 R. C. L. Supp. 430; 5 R. C. L. Supp. 359.

manufacturers, merchants, and others dealing with the public. Its method of business is to secure contracts with local street car companies for space within their cars at fixed rental to display cards of local advertisers from whom it secures contracts. It furnishes so-called "carders" to properly arrange and care for their displays in the cars. It is domesticated for business in this State and operates in the city of Lansing under a contract with the local street car line.

Defendant is engaged in the business of dry cleaning and dyeing in the city of Lansing under the name of Riker's Dry Cleaning and Dye Works. On October 21, 1921, he signed a contract with plaintiff, through its soliciting agent, for car card advertising in the street cars of Lansing at the rate of $20 a month for 60 months, commencing on December 1, 1921. Plaintiff's blank form of contract in duplicate was filled out in defendant's presence, after he had looked over the form at his office in Lansing, by the soliciting agent. He signed and handed the duplicates back to the agent who forwarded them to New York for acceptance. Plaintiff accepted the contract on October 31, 1921, sending one of the duplicates to defendant on November 1st, with a letter calling his attention to its date and stating that it covered "a period of 60 consecutive months from December 1, 1921." He received the letter and duplicate, states that he "just glanced over it," and instructed the office girl to file it with the contract. Performance of the contract was commenced on December 1, 1921, with plaintiff's cards properly displayed in the city street cars of Lansing, for which he paid $20 a month until August 10, 1922, when, after some correspondence, he wrote a letter to plaintiff's attorney in New York repudiating the contract on the ground that it was obtained by fraudulent misrepresentations.

Correspondence was opened upon that subject by defendant's letter of March 4, 1922, reading as follows:

"BARRON G. COLLIER.

"*Dear Sir:*   Find inclosed check for $19.60 for street car advertising.   What are the short term rates if we should ever desire to stop this advertising?
"Yours truly,
"F. B. STEBBINS."

To which plaintiff replied by letter dated March 10, 1922, as follows:

"RIKER'S DRY CLEANING AND DYE WORKS,
"326 N. Capitol Avenue,
"Lansing, Michigan.
"*Dear Sir:*   Responding to yours of March 4th, we do not make short term contracts, consequently have no short term rate.   Instead all our contracts are for long terms and not subject to cancellation at any time. With best wishes, we are
"Yours very truly,
"BARRON G. COLLIER, INC.,
"Advertising Department,
"By J. P. R."

To this defendant replied by a letter on March 18, 1922, as follows:

"BARRON G. COLLIER,
"Candler Building,
"New York, New York.
"*Dear Sir:*   In regard to your letter of March 10th, your agent lead me to understand that our contract was for a period of one year.   This was told me in the presence of the witness.   After talking for some time I told him I would take it.   He then produced an order blank or contract which he asked me to sign. As I was very busy I merely glanced over the four hundred or five hundred words and did not detect that they read sixty months in place of twelve months.   I cannot believe that a firm of your size wants business secured in this way or would try to hold me to an agreement so trickily made.   If you care to change the wording of this contract to twelve months, I will be satisfied.   Please let me hear from you.
"Yours truly,
"RIKER'S DRY CLEANING COMPANY,
"F. B. STEBBINS, Proprietor."

Plaintiff resented defendant's charge of trickery, and further correspondence followed, mostly immaterial here, defendant saying in one of his letters: "We decline to be bound any further under the alleged contract which is dated October the 21st, 1921." Plaintiff presented bills to defendant regularly for each month's services until his letter of August 10, 1922, positively repudiating and rescinding the contract. . Plaintiff thereafter brought this action, which was once before tried by jury and a new trial granted.

At conclusion of testimony on the trial here for review, plaintiff's counsel moved for a directed verdict in its favor for $632, balance due on the contract to that time, on the ground, in substance, that defendant's testimony failed to raise any issue for the jury under his claim of fraudulent inducement to sign the contract, which the court denied and submitted that question to the jury, resulting in verdict and judgment for defendant. Motion for a new trial was made which was also denied. Plaintiff appeals by assignments of error which condense to the propositions that defendant's evidence did not support the verdict against plaintiff's otherwise unquestioned *prima facie* case, the court erred in refusing to direct a verdict for plaintiff in the sum of $632 as requested, and the verdict is clearly against the great weight of evidence.

It is undisputed that defendant signed this contract for car card advertising on his desk at his place of business in the city of Lansing, and that plaintiff then had a contract with the electric railway company which operates a street car line in that city for the car card advertising rights on its cars, as described. On October 21, 1921, J. S. Asbury, an experienced agent of plaintiff, accompanied by a new man just learning the business named Wilson, called upon defendant about 11 o'clock in the forenoon at his place of business for the purpose of securing his patronage

as a street car advertiser in cars operated in Lansing, explained the nature and benefits of such advertising, discussed with him the form and terms of a 60-month contract with plaintiff as also for a shorter term, and said if he would sign a 60-month contract he would be guaranteed advertising space in the cars for that length of time and protected against advanced rates which were then especially low in Lansing. The interview lasted intermittently for about two hours, interrupted by defendant waiting on trade, answering telephone, etc. Most of the conversation was between defendant and Asbury who had been in the business for years and was informed as to the population of Lansing, number of street cars operating in it, percentage of people apt to read such advertising, etc. When defendant stated he might not be in business that long, Asbury told him in that event plaintiff would cancel his contract as was its policy in case a customer went out of business or died. At the noon hour defendant's office girl went out to lunch and discussion of the subject was continued, when defendant was at liberty, resulting in his deciding to contract for such advertising. Asbury had handed him a blank form for a 60-month contract, which, as they talked, lay before him on his desk back of the counter for "fifteen or twenty minutes, maybe longer," as Asbury said. In his direct testimony defendant said:

"It was a short time before they left or maybe an hour or half an hour—I should say twenty minutes to half an hour. Mr. Asbury gave it to me. I do not think there had been any writing added to the form at the time that I first saw it. * * * If I remember rightly, the thing lay there for quite a while and I glanced over it and handed it back to them and I think I talked some more. He said, 'Well, I will fill it out for you.' I said, 'Well, I will take it.' He said, 'I will fill it out for you.'

"*Q.* Was there any other conversation at that time —was anything said at that time regarding what the total cost of that contract would be?

"*A.* Well, I said, somewhere in there that I could stand $240 a year; I could take a chance on that.

"*Q.* Will you repeat that, what it was you said?

"*A.* I said that I could take a chance on $240 a year.

"*Q.* At the time that you said that, what did you have in mind, what length of contract?

"*A.* Well, one year; that was the only thing I figured on. That is my signature that appears on the exhibit offered here.

"*Q.* At the time you did sign, what did you think the contract specified as to period of duration? (Objection.)

"*A.* I thought it was for one year.

"*Q.* Did you read the contract?

"*A.* I did not read it all, no. I just glanced over it.

"*Q.* What do you remember of seeing—was there any particular item that you recall looking at at the time you examined the contract?

"*A.* I think I looked at the price, that was what I was thinking of, to see if the price was right; half run and $20 was the main thing I was looking for."

On cross-examination he testified:

"I stated on direct-examination that the contract was lying before me for a period of about fifteen minutes. It was on the desk in back of the counter. Mr. Asbury had not been around in back of the counter at the inner desk.

"*Q.* You had laid the contract over on the desk, had you?

"*A.* He just handed it over to me.

"*Q.* When he handed you the contract, I think you stated that you glanced it over, did you?

"*A.* Yes, sir.

"*Q.* There was not much to glance over, was there, until you came down to the body of the contract? There was quite a lot of　*　*　*

"*Q.* Do you recall when you saw the contract, the letters at the top of the contract in red ink, 'contract for advertising,' do you remember seeing that part of it?

"*A.* I cannot say that I do.

"*Q.* Was the contract filled in, that is written in, by pen and ink as it appears here now when it was handed to you?

"*A.* I do not think so; the first time I think it lay there blank for probably fifteen minutes.

"*Q.* That is, lay there on the desk, you mean?

"*A.* Yes, sir.

"*Q.* And then did you hand it back to Mr. Asbury?

"*A.* That is my impression.  He says, 'I will fill it out;' he took it to this desk and filled it out.

"*Q.* And later handed it back to you a second time?

"*A.* Handed it back and told me where to sign it.

"*Q.* Well, did you glance it over after he handed it back to you?

"*A.* I thought I did.

"*Q.* Well, what is your recollection now, do you think you did?

"*A.* Why, yes; yes, sir.  *  *  *

"*Q.* Do you remember seeing the words December 1, 1921, immediately following the word sixty?

"*A.* I think that was what I glanced at more than anything else, the part that was written in there, I would be more liable to see that than the other.

"*Q.* Wouldn't you have been just as liable to see the word 'sixty' and the figure '60' immediately preceding the words 'December 1' as you would the words 'December 1, 1921'?   (Objection)

"*A.* Evidently not.

"*Q.* But you do recall seeing the words 'twenty dollars' written in the blank space?

"*A.* Yes, sir.  *  *  *

"*Q.* Was there any reason at all to prevent you from having examined the contract more carefully?

"*A.* Just a matter of time, I suppose.

"*Q.* That is, you could have gone over it if you had wanted to, could you not?

"*A.* Yes, sir."

This contract consists of but two paragraphs, printed on one side of a sheet of bluish paper, 8¾ inches in width and 6¼ inches in length.  The first paragraph is set in black-faced type in wide spaced lines, and, exclusive of a description of the parties, consists of five lines.  The third and fourth, so far as material here, are as follows (beginning and ending as shown—italicized where the form is filled in with a pen):

"for SIXTY (60) MONTHS from *December 1-1921,* size
*   *   *   *agrees to pay the sum of Twenty and 00/100*
Dollars per month."

The second paragraph is set solid and contains de-
tailed provisions of the contract immaterial here.   In
the lower right-hand corner, just under defendant's
signature, the following appears printed in red ink:

"NOTICE TO THE PERSON SIGNING THIS CONTRACT.
Read the terms of· this contract before signing it, as
no statement, settlement, agreement, understanding
or representation verbally made or written and not
contained herein, will be recognized."

No claim is made by defendant of any direct repre-
sentation or intimation by Asbury or any one else that
he was signing a one-year contract.   His claim of
fraud and trickery is apparently based on his testi-
mony that he told Asbury he would not be interested
in a five-year contract, and when he later signed the
60-month contract shown him he said he "could stand
$240 a year," and "thought it was for one year."   The
principal diversity in their testimony as to the inter-
view is Asbury's claim that his talk was largely
directed to convincing defendant of the advantages of
their usually issued contract, and the principal dis-
cussion, as he remembered it, "was as to the length
of the contract," meaning the length of time the con-
tract was to run, and they "discussed that at length
very fully," while defendant claimed the talk was
largely devoted to Asbury "discussing with me the
advantages of street car advertising in general."   Of
the five-year period he was asked by his counsel, and
answered:

"*Q.* Do you mean that when you told him you would
not be interested in that, that there was no talk after
that?

"*A.* The subject was then changed to something
else; I do not recall what it was."

Defendant was a business man dealing with strangers in a matter relating to his business.   He was by no means illiterate, ignorant, or unsophisticated.   He was a graduate of the Lansing high school, had attended the University of Michigan for two years, had been a clerk for the Lansing Company, of which his father was president, for three years and a half, was in the army for some months, after which he worked for a time at the Auto Body Company, then went to Ohio as an agent selling cars for the Ford Motor Company for a year, then returned to Lansing and purchased the dry cleaning business in which he was engaged at the time this contract was entered into.   He testified that he had advertised this business constantly since he entered upon it, and believed "that advertising pays."

Whatever was talked over and agreed upon between the parties was presumptively merged in their written contract.   Defendant was an educated man with years of business experience and was dealing at arm's length with a party he had never met before.   No fiduciary relations existed between them.   This plain and comparatively short contract was placed before him with ample time and opportunity for him to consult it and satisfy himself as to its provisions.   There is no proof of any fraudulent reading or misstatement as to the contents of this contract.   He had available and directly before him means of information as to the truth or falsity of the fraudulent misrepresentations complained of, equally accessible to both parties.

"The common law affords to every one reasonable protection against fraud in dealing; but it does not go the romantic length of giving indemnity against the consequences of indolence and folly, or a careless indifference to the ordinary and accessible means of information.   It reconciles the claims of convenience with the duties of good faith, to every extent compatible with the interests of commerce."   2 Kent's Commentaries (14th Ed.), 484, 485.

"Generally speaking, if the parties have equal means of information so that with ordinary prudence or diligence either may rely on his own judgment he is presumed to have done so, or, if he has not done so he must abide the consequences of his own folly or carelessness." Smith on the Law of Fraud, p. 107.

"But the courts appear to be unanimous in holding that a person who, having the capacity and an opportunity to read a contract, is not misled as to its contents, and who sustains no confidential relation to the other party, cannot avoid the contract on the ground of mistake if he signs it without reading it, at least in the absence of special circumstances excusing his failure to read it. If the contract is plain and unequivocal in its terms he is ordinarily bound thereby. It is the duty of every contracting party to learn and know its contents before he signs and delivers it. * * * To permit a party, when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made, or to allow him to admit that he signed it but did not read it or know its stipulations, would absolutely destroy the value of all contracts. The purpose of the rule is to give stability to written agreements, and to remove the temptation and possibility of perjury, which would be afforded if parol evidence was admissible." 6 R. C. L. p. 624.

*Vide*, also, *Price* v. *Marthen,* 122 Mich. 655; *Northern Assurance Co.* v. *Meyer,* 194 Mich. 371; *Saginaw Medicine Co.* v. *Lee,* 226 Mich. 561.

There is not sufficient evidence in defendant's own testimony, viewed in its most favorable light, to carry the defense of fraud to the jury. On this record the jury should have been so instructed and a verdict directed in plaintiff's favor for the amount shown due under the contract.

The judgment is therefore reversed, with costs to plaintiff, and a new trial granted.

BIRD, C. J., and SHARPE, SNOW, FELLOWS, WIEST, CLARK, and MCDONALD, JJ., concurred.