KOMRAUS PLUMBING & HEATING, INC, *v*
CADILLAC SANDS MOTEL, INC

1. CONTRACTS—OFFER—ACCEPTANCE.

   By an objectively unequivocal acceptance, the acceptor is bound thereby and not permitted to avoid the consequences of his acceptance by proving that he didn't mean it, or didn't know or understand the terms of the offer, or was mistaken about the legal consequences of the contract.

2. CONTRACTS—MISTAKE—FRAUD—MISREPRESENTATION.

   One who signs a contract will not be heard to say, when enforcement is sought, that he did not read it, or that he supposed it was different in its terms; but that general rule is not applicable when the neglect to read is not due to carelessness alone, but was induced by some stratagem, trick, or artifice on the part of the one seeking to enforce the contract.

3. EVIDENCE—PAROL EVIDENCE RULE—CONTRACTS.

   The parol evidence rule says that parties who contract in writing are conclusively presumed to have intended what they have written, as their complete agreement, so that they may not offer parol testimony to vary or contradict their writing.

4. EVIDENCE—CONTRACTS—WRITTEN CONTRACTS—PRESUMPTIONS.

   Where parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that their whole engagement, and the extent and manner of their undertaking, were reduced to writing; and no evidence is permitted tending to vary

REFERENCES FOR POINTS IN HEADNOTES

[1] 17 Am Jur 2d, Contracts §§ 2, 31–34.
[2, 5] 17 Am Jur 2d, Contracts §§ 143–152.
[3] 30 Am Jur 2d, Evidence § 1016 *et seq.*
[4] 30 Am Jur 2d, Evidence §§ 1044, 1045.
[6] 17 Am Jur 2d, Contracts §§ 448–457.

or contradict its terms, or to substitute a new or different contract for it.

5. CONTRACTS — ACCEPTANCE — UNILATERAL MISTAKE — FRAUD — MISREPRESENTATION.

Execution of a contract by defendant's president may have resulted from a mistaken assumption on his part, but it was a unilateral mistake, neither shared, known to, or caused by the plaintiff, nor was he the victim of any fraud or misrepresentation on the part of plaintiff; defendant's president knowingly put his signature to an acceptance which was clear in its meaning, and cannot now say that it meant something different or meant nothing at all because it was his duty to examine the contract and to know what he signed.

6. CONTRACTS—BREACH OF CONTRACT—ANTICIPATORY BREACH.

Plaintiff was not guilty of breach of contract and there was an anticipatory breach by defendant where defendant was under the impression that there was no direct contract with plaintiff, but plaintiff made its position known to defendant when there was yet time to perform and defendant contracted the job to another contractor.

Appeal from Court of Appeals, Division 3, Fitzgerald, P. J., and V. J. Brennan and T. M. Burns, JJ., reversing Wexford, William R. Peterson, J. Submitted March 8, 1972. (No. 7 March Term 1972, Docket No. 53,332.) Decided April 6, 1972. Rehearing denied May 29, 1972.

31 Mich App 674 reversed.

Complaint by Komraus Plumbing & Heating, Inc., against Cadillac Sands Motel, Inc., for damages for breach of contract. Third-party complaint by Cadillac Sands Motel, Inc., against Ken-Bar Construction Co., Inc., for damages. Judgments for plaintiff and third-party plaintiff. Defendant Cadillac Sands Motel, Inc., appealed to the Court of Appeals. Reversed. Plaintiff appeals. Reversed.

*Herrinton, Herrinton & Hughes,* for plaintiff.

*Butzel, Levin, Winston & Quint,* for defendant
Cadillac Sands Motel, Inc.

T. E. BRENNAN, J.   This cause was tried before
the Honorable William R. Peterson at the circuit.
On May 7, 1969, Judge Peterson filed a written
opinion, which was thorough, scholarly, and correct-
ly dispositive of the issues joined between the par-
ties.   The opinion follows.   We adopt it as the opin-
ion of this Court.   The decision of the Court of
Appeals is reversed and judgment of the circuit
court is affirmed.   Costs to the appellant.

## Opinion of the Trial Court.

"Plaintiff is a corporation, the president of which
is Charles E. Komraus.   All negotiations and events
material to the case were handled by Mr. Komraus,
and for purposes of simplicity, he will be referred
to as plaintiff hereafter.

"In the spring of 1968, defendant planned a sub-
tantial addition to its physical plant.   The third
party defendant, Ken-Bar Construction Company,
Inc., entered into a contract with defendant to do the
work as general contractor.   Ken-Bar's supervisor,
Howard Reynolds, provided plaintiff with plans for
the addition and invited a bid from plaintiff as
plumbing and heating sub-contractor.   In the course
of preparing to submit an offer to Ken-Bar, plaintiff
consulted with his insurance agent regarding insur-
ance requirements and a performance bond.   The
agent cautioned plaintiff that Ken-Bar would have
difficulty furnishing a performance bond, and that
Ken-Bar's condition was questionable.   The agent
advised plaintiff to deal directly with the owner.

"Acting on this advice, plaintiff prepared an offer
dated April 29, 1968, and procured a performance
bond.   The offer was, by its terms, addressed to
'Vernon Vincent, Cadillac (sic) Sands Motel,' and
was delivered by plaintiff to Reynolds of Ken-Bar,

to be transmitted to Vincent. Reynolds in turn gave it to Ken-Bar's president, Harold Brickner, who presented it to Vincent at Cadillac on April 30th. It may be noted that Vincent was not personally the owner of the property in question, but is president of the corporate owner and defendant herein.

"The written proposal is unambiguous, and at the bottom bears the following language:

#### " 'ACCEPTANCE OF PROPOSAL

" 'The above prices, specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payment will be made as outlined above.'

"The proposal was returned to plaintiff without alteration or addition bearing the following beneath the above quoted language of acceptance:

" 'Accepted Ken-Bar Const. Co., Inc.

" 'Date: 4/30/68

" 'Signature Harold Brickner—Pres.

" 'Signature Vernon Vincent—Pres.

" 'Cadillac Sands Motels, Inc.'

"Plaintiff insists, and the court believes, that he never intended to submit the offer to Ken-Bar. Ken-Bar's acceptance might have amounted to a counter-offer which plaintiff might have accepted, but this was not done and the execution of the acceptance by Ken-Bar did not give rise to a contract between it and plaintiff. Ken-Bar's acceptance is irrelevant, and had no legal consequences.

"Vincent's signature to the acceptance is admitted, but defendant contends that it was not an actual acceptance and did not create a contract (1) because Vincent executed the acceptance without intending to contract with plaintiff, and (2) because the signature was added in a corporate capacity while the offer was direct to him personally.

"As to the latter point, this is essentially a question of identity in legal form and not a situation

where an offer was directed to a clearly identified person and acceptance was claimed to have been made by a different person.  Were plaintiff to hold Vincent personally, the point would be well taken.

"As to the effectiveness of the acceptance, the Court is satisfied as to the truth of Vincent's testimony that he intended to deal only with one general contractor and did not intend to make a separate contract with plaintiff.  Brickner presented plaintiff's proposal to Vincent with Brickner's apparent acceptance on behalf of Ken-Bar, already written thereon.  Brickner told Vincent that Vincent's signature was necessary in order to get a performance bond.  The court does not believe Brickner's testimony that he had been told by plaintiff that Vincent's signature was needed only for that purpose. It is true, however, that Brickner told Vincent that he was to sign only for that purpose, and that Vincent signed the acceptance only upon Brickner's assurance that there would be no separate contract between defendant and plaintiff.  It might also be added that the matter of performance bonding was of great concern to Vincent at the time because of Ken-Bar's problems in getting bonds, and because such bonding was a prerequisite to Small Business Administration approval of defendant's loan application.  Vincent's conduct at all times thereafter is consistent with an assumption on his part that there was no direct contract with plaintiff and that plaintiff was only a subcontractor.

"The trouble with defendant's contention that there was no meeting of the minds so as to create a contract, is that the usual objective tests of offer and acceptance are satisfied by Vincent's deliberate act in executing the acceptance, which was returned to plaintiff without explanation.  By an objectively unequivocal acceptance, the acceptor is bound thereby and not permitted to avoid the consequences of his acceptance by proving that he didn't mean it, or didn't know or understand the terms of the offer, or

was mistaken about the legal consequences of the contract.

"In *International Transportation Association* v. *Bylenga,* 254 Mich 236, [1931], at p. 239, the court said:

" 'This court has many times held that one who signs a contract will not be heard to say, when enforcement is sought, that he did not read it, or that he supposed it was different in its terms. *Gardner* v. *Johnson,* 236 Mich 258 [1926]; *Draeger* v. *Kent County Savings Ass'n.,* 242 Mich 486 [1928]; *Powers* v. *Indiana & M. Elec. Co.,* 252 Mich 585 [1930]. But the general rule announced in those cases is not applicable when the neglect to read is not due to carelessness alone, but was induced by some stratagem, trick, or artifice on the part of the one seeking to enforce the contract.'

"See also 17 C.J.S., p 672 (s 41 (f) Contracts); *Collier* v. *Stebbins,* 236 Mich 147 [1926]; *Crane* v. *Smith,* 243 Mich 447 [1928]; and *Renard* v. *Clink,* 91 Mich 1 [1892].

"Another side of the same question is presented by the parol evidence rule which says that parties who contract in writing are conclusively presumed to have intended what they have written, as their complete agreement, so that they may not offer parol testimony to vary or contradict their writing. In *Adair* v. *Adair,* 5 Mich 204 [1858], at p 209, the court said:

" 'To hold that a party may reply to an action upon a written instrument, "It is true I made the contract, but it was not my agreement, and I did not intend to be bound by it," would set the law of contracts all afloat, render the certainty of the law a fiction, and place the obligations of parties beyond judicial control. It is true that, if there be fraud or mistake in the contract, equity will relieve, to annul or correct it, as the case may be; but it exercises this jurisdiction in cases of fraud upon grounds of pub-

lic policy, as well as to relieve an injured party
from injustice through the designs of another; and
in those of mistake, upon the ground that the instru-
ment is not made to speak the real intent of the par-
ties.   In both instances, however, clear and une-
quivocal proof is required to authorize the interfer-
ence of the court.

" 'But where the parties have deliberately and un-
derstandingly executed an instrument—where one
has not been defrauded, or both mistaken—they can
not afterwards be permitted, in any court, to insist
that it does not express their real intentions, but
that quite another thing was designed.   The true
rule is: Where parties have deliberately put their
engagements into writing, in such terms as import
a legal obligation, without any uncertainty as to the
object or extent of such engagement, it is *conclu-
sively presumed* that their whole engagement, and
the extent and manner of their undertaking, were
reduced to writing; and no evidence is permitted
tending to vary or contradict its terms, or to substi-
tute a new or different contract for it.'

"The observations quoted give allowance for mis-
take which is *mutual,* but that is not the case here.
Mr. Vincent's execution may have resulted from a
mistaken assumption on his part, but it was a uni-
lateral mistake, neither shared, known to, or caused
by the plaintiff.   Nor was Mr. Vincent the victim
of any fraud or misrepresentation on the part of the
plaintiff.   He knowingly put his signature to an ac-
ceptance which was clear in its meaning, and cannot
now say that it meant something different or meant
nothing at all.   As in the case of one who signs with-
out reading,

" 'It was his duty to examine the contract, to
know what he signed, and complainants cannot be
made to suffer for this neglect on his part.' *Liska* v.
*Lodge,* 112 Mich 635 [1897], at p 637.

"Defendant contends that, even if a contract ex-
isted between it and plaintiff, it did not breach the

contract, but that plaintiff repudiated the contract, or was first guilty of breach by refusal to perform on May 10, 1968.

"The evidence indicates that plaintiff had seen the site prior to preparing his offer. He had a close relationship with Ken-Bar's Reynolds and was expecting to be advised by Reynolds when the project reached a stage where he should commence his work. On May 10, Brickner called plaintiff. Plaintiff says Brickner asked him when he could start. Brickner says he told plaintiff they were ready for him to start and that plaintiff flatly refused to go ahead with the job. Brickner's testimony on that point, however, is not convincing. It is clear that plaintiff told Brickner that he was waiting to hear from Reynolds and that Brickner told him Reynolds had just left Ken-Bar. Plaintiff's recollection of his response, slightly different from Brickner's, is that he replied that if Reynolds was not on the job, 'I may be through.' At any rate, plaintiff testified that he told Brickner he wanted to discuss the situation with Reynolds and would then get in touch with Brickner to which Brickner assented. Brickner confirmed this on cross-examination, contrary to his initial assertion that plaintiff flatly refused to get on the job. Over the next few days, plaintiff did talk to Reynolds, made a trip to Cadillac to see if the job was ready for him (and found it was not) and on the 18th tried without success to reach Brickner. On the 20th he did reach Brickner by phone and was told either that there was, or that there was going to be, another plumber on the job.

"In fact, Brickner made no attempt to contact plaintiff, and without waiting to hear from him contracted the job with another plumber on May 13th. The testimony of plaintiff that the work was not at the stage where the plumbing and heating contractor had to be on the job as of his inspection on May 16th is not contradicted, nor is there any serious dispute that this was still true as late as May 27th.

"On May 22, plaintiff wrote advising that he was holding defendant to his contract and expected to be allowed to perform it. On May 31, plaintiff received a letter from Ken-Bar (Brickner), dated May 25, claiming that plaintiff had refused to begin work May 10, and saying:

" 'Accordingly I have terminated your purchase order and have been forced to contract this work to others at an increase in cost. I am sorry we had to take this action, but our contract specifically emphasizes the essence of time for completion of the building.'

"By way of reply, plaintiff again wrote directly to defendant on May 31, indicating readiness to proceed with the contract. No reply was received, and on June 6 plaintiff came to the site and found that the plumbing work had been commenced by another contractor.

"On these facts, the court cannot find that plaintiff was guilty of a breach of the contract, nor can it be seriously contended that there was not an anticipatory breach thereof by defendant. Defendant was under the impression that there was no direct contract with plaintiff, but plaintiff made its position known to defendant when there was yet time to perform. There could hardly be room for argument about the breach when another contractor went onto the job thereafter.

"Testimony was taken tending to establish a means of computing the profit that Komraus would have realized had it been permitted to perform the contract. The court finds such lost profit to be in the amount of $7,747.80, for which sum judgment may be had against defendant.

"As to defendant's third party complaint against Ken-Bar, the facts leave no doubt that defendant's liability to plaintiff arises solely because of Brickner's representation inducing Vincent's execution of the acceptance and his subsequent replacement of

plaintiff on the job. Judgment may accordingly be entered for the third party plaintiff against the third party defendant in the amount of $7,747.80."

T. M. KAVANAGH, C. J., and BLACK, ADAMS, T. G. KAVANAGH, and WILLIAMS, JJ., concurred with T. E. BRENNAN, J.

SWAINSON, J., concurred in the result.