**Robert M. BARTO, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 92–CV–74240–DT.

United States District Court, E.D. Michigan, S.D.

May 28, 1993.

Susan Munnane, Troy, MI, for plaintiff.

Mary Rigdon and Keith Morgan, Washington, DC, for defendant.

*OPINION AND ORDER REGARDING THE PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT*

ROSEN, District Judge.

I. *INTRODUCTION*

This luxury tax refund case is before the Court on the parties' Cross–Motions for Summary Judgment. The parties are in agreement that there is no genuine issue of material fact in this case, and resolution of this matter involves only the legal issue of whether a legally cognizable binding contract existed before September 30, 1990 between Plaintiff Robert Barto, as purchaser, and Estate Motors, Ltd., as seller, for the purchase of a new 1991 Mercedes–Benz 500SL automobile.

Having reviewed and considered the parties' Cross–Motions and supporting Briefs, and having heard the oral arguments of counsel at the hearing held on May 27, 1993, the Court is now prepared to rule on the Cross–Motions. This Opinion and Order sets forth that ruling.

## II. *PERTINENT FACTUAL BACKGROUND*

On February 21, 1990, Plaintiff Robert Barto and his wife went to Estate Motors, Ltd. of Birmingham, Michigan to purchase a new Mercedes–Benz 500SL automobile. Barto was advised that due to limited production in Germany and the great demand for that particular model, it would be at least 18 months before a new 500SL could be delivered to him. He was told by the salesman, Doug MacFarlane—with whom Mr. Barto had dealt previously—that an order for the manufacture of the car of his choice would be placed for him if Barto would pay a $500 deposit with the order. Barto agreed and paid Estate Motors $500 with his personal check. [See Plaintiff's Ex. 6].

## *EXECUTION OF THE RETAIL BUYER'S ORDER FORM AND THE DEALER'S PLACEMENT OF BARTO'S ORDER WITH THE MANUFACTURER*

Barto and MacFarlane, acting on behalf of Estate Motors, accordingly, executed a "Retail Buyer's Order" form. That form provided on its face, in pertinent part, as follows:

### Retail Buyers Order

**ESTATE MOTORS, LTD.**
464 S. Woodward Telephone 644–8400
BIRMINGHAM, MICHIGAN 48011

Purchasers
Name ___ Robert Barto ___ Date ___ Feb. 21, 1990 ___

___ NEW ___ CAR
PLEASE ENTER MY ORDER FOR ONE Mercedes Benz___ USED ___ TRUCK AS FOLLOWS

| Year | Make | Model or Series | Body Type | Color | Trim |
|---|---|---|---|---|---|
| 1991 | Mercedes Benz | 500SL | 2 Door | 199 Black Pearl | Gray Leather |

MVI or Serial No. Stock No. To be Delivered On or About ___ 19 ___

CASH PRICE OF VEHICLE

| 199 | Black Pearl— |
|---|---|
| | Gray Leather— |
| 740 | Black Soft Top |

TOTAL
TAX

TOTAL CASH DELIVERED PRICE

CASH DEPOSIT SUBMITTED WITH ORDER 500—

SALESMAN ___ /s/ [Doug MacFarlane] ___ SIGNED ___ /s/ [Robert Barto] ___ PURCHASER

PURCHASER'S
NAME ___ Robert Barto ___

**THIS ORDER IS NOT VALID UNLESS SIGNED BY DEALER OR HIS AUTHORIZED REPRESENTATIVE APPROVED:** ___ 
Dealer or Authorized Representative

STREET
ADDRESS ___ 1 Windward Place ___
CITY & STATE ___ Grosse Pointe Farms ___ ZIP 48236
BUS. PHONE ___ RES.PHONE 886–2277

### THIS ORDER IS NOT A BINDING CONTRACT

.................... CASH OR CASHIER'S CHECK UPON DELIVERY ....................

[Plaintiff's Ex. 6]

As evidenced by the foregoing, no price was specified on the form,[1] and neither the Dealer nor his Authorized Representative signed in the space provided to indicate the Dealer's approval of the Order.

The reverse side of the Retail Buyer's Order form further contained ten "Additional Terms and Conditions" which set forth the conditions under which the purchaser had a right of cancellation; the dealer's warranties and disclaimer of warranties; the reservation of the manufacturer's rights to change the price and to change the design of the model purchased; and a limitation of the purchaser's damages. The tenth term on the reverse side of the form provided, "The Purchaser, before or at the time of delivery of the motor vehicle covered by this Order will execute such forms of agreement or documents as may be required by the terms and conditions of payment indicated on the front of this Order."

As indicated above, the "terms and conditions of payment" on the front of the form executed by Messrs. Barto and MacFarlane called for "Cash or Cashier's Check Upon Delivery."

The day after Messrs. Barto and MacFarlane executed the Retail Buyer's Order form, on February 22, 1990, Estate Motors' placement of an order with the manufacturer for a new 500SL Mercedes–Benz with the body and interior color and upholstery specifications requested by Mr. Barto was confirmed

in an "Advance Production Reservation Request". [See Plaintiff's Ex. 7.] This preproduction order form was signed by the Dealer.

The following day, February 23, Estate Motors cashed Mr. Barto's $500.00 check.

## THE ENACTMENT OF INTERNAL REVENUE CODE LUXURY TAX AMENDMENTS

Nine months later, on November 5, 1990 Congress amended the Internal Revenue Code in Pub.L. 101–508, taxing a "luxury tax" on purchases of certain passenger vehicles, boats and aircraft.[2] The new "luxury tax" provisions, however, did not take effect immediately. Rather, Congress made the new luxury tax provisions set forth in Pub.L. 101–508 effective on January 1, 1991 with one exception—the new tax would not be imposed on sales made after December 31, 1990 if there was a binding contract for the purchase of a covered luxury item in existence as of September 30, 1990.[3]

## DELIVERY OF BARTO'S MERCEDES–BENZ

In mid-August 1991—i.e., nearly 18 months after Barto's payment of the $500 deposit and the execution of the Retail Buyer's Order and the Advance Production Request forms and more than eight months after the effective date of Pub.L. 101–508—. Mr. MacFarlane telephoned Mr. Barto and informed him that his Mercedes would be at

---

1. It appears to be undisputed that the reason no price was stated on the Retail Buyer's Order form was that the price for a new Mercedes could not be determined 18 months in advance. Mr. Barto testified at his deposition that in executing the Retail Buyer's Order form with no price specified he understood that when his car came in he was going to be required to pay "what's on the sticker." [Barto Dep.Tr. p. 72.]

2. With respect to automobiles, new Section 4001(a) was added to Title 26. That section provides in pertinent part:
 (a) **Imposition of tax.**—There is hereby imposed on the 1st retail sale of any passenger vehicle a tax equal to 10 percent of the price for which so sold to the extent such price exceeds $30,000.
 26 U.S.C. § 4001(a).

3. Section 11221(f) of Pub.L. 101–508, the Omnibus Budget Reconciliation Act of 1990 ("the

1990 OBRA amendments") provided, in pertinent part, as follows:
 **(1) In general.**—The amendments made by this section [enacting sections 4001 to 4012 of Title 26] ... shall take effect on January 1, 1991.
 **(2) Exceptions for binding contracts.**—In determining whether any tax imposed [by these amendments] applies to any sale after December 31, 1990, *there shall not be taken into account the amount paid for any article (or part or accessory therefor) if the purchaser held on September 30, 1990, a contract (which was binding on such date and at all times thereafter before the purchase) for the purchase of such article (or part or accessory.)*
 See 26 U.S.C. § 4001, Historical and Statutory Notes (emphasis added).

the dealership and ready for his pick up on August 30. MacFarlane also informed Barto in that telephone conversation for the first time that he would have to pay the luxury tax on his new car (in addition to the purchase price, state sales tax and license/title fees) when he came to pick it up.[4]

Mr. Barto was angry about having to pay the luxury tax because he believed that his car fell within the scope of the pre-existing binding contract exception because his order for the car had been placed before September 30, 1990. During the ensuing weeks before his car arrived at Estate Motors, Mr. Barto telephoned Mercedes–Benz district sales representatives and legal counsel and was informed that Mercedes–Benz was advising their dealers that the new luxury tax was not to be assessed on cars ordered before September 30, 1990. Mr. Barto also learned that of the 114 Mercedes–Benz dealers within the midwest region, only Estate Motors was assessing the tax on cars ordered before September 30, 1990.

Mr. Barto attempted to negotiate a manner of payment of the tax with Estate Motors. He first proposed that he bring with him two checks when he picked up his car—one check payable to Estate Motors for everything but the amount of the luxury tax, and one check for the luxury tax payable to the IRS. The dealer refused this arrangement. Barto then suggested that he pay the luxury tax into an "escrow" account. Again, the dealer refused. Because Mr. Barto wanted his new car, he ultimately agreed to pay Estate Motors the full purchase price, including the luxury tax assessment.

On August 30, 1991, Mr. Barto went to Estate Motors to pick up his Mercedes–Benz. On that date, he tendered to the dealer his check for $111,446.00 to cover the $99,950.00 purchase price of the car, the sales tax/license/title fees of $4,501.00, and the 10% luxury tax amounting to $6,995.00. Mr. Barto and the dealer also executed on August 30th Estate Motors' "Statement of Vehicle Sale" which reflected the breakdown of his $111,946.00 total purchase price,[5] license/title transfer and proof of insurance information, and the odometer disclosure. [See Plaintiff's Ex. 8.]

The Dealer's representative's signature on the Statement of Vehicle Sale form is prefaced by only the printed statement, "I certify I sold this vehicle to the purchaser named in this form. I hereby warrant the title to the vehicle and certify that the vehicle is subject only to the security interests named above."[6]

Above Mr. Barto's signature appears only the following sentence, "I state that I am the purchaser of the above described vehicle and I am the applicant for Michigan Certificate of Title and Registration."

Mr. Barto continued to protest having to pay the $6,995.00 luxury tax on his new Mercedes after picking the car up. The dealer provided Mr. Barto with a blank IRS 843 form for a tax refund. When the IRS denied Mr. Barto's claim for refund, he instituted this action.

### THE PARTIES' ARGUMENTS

Plaintiff's position in this matter is that the Retail Buyer's Order form that he and Doug MacFarlane executed on February 21, 1990 and Barto's payment of the $500.00 deposit, together with the dealer's February 22, 1990 execution of the Advance Production Reservation Request form establish a "binding contract" between Barto and Estate Motors for the purchase of the Mercedes–Benz and,

---

**4.** Although this was the first time Mr. Barto was specifically told that the purchase of his car would be subject to the new luxury tax, he testified in his deposition that this was not the first time that he discussed the new tax with Estate Motors employees. He had, in fact, discussed the new tax in general terms with Estate Motors people several times when he had his old car in for service earlier in the summer of 1991, and testified that the dealer personnel believed that the tax was going to be repealed sometime after June 27th. According to Mr. Barto's testimony, these discussions with Estate Motors people never touched upon his purchase of the new Mercedes but rather only whether the tax was affecting the dealer's sales, in general.

**5.** The $111,446.00 actually paid by Barto on August 30 reflects the credit of his $500.00 deposit against the total purchase price of $111,946.00.

**6.** As indicated above in the text of this Opinion and Order, Mr. Barto purchased the car for cash, thus, there are no security interests.

therefore, his new car should be deemed within the "pre-existing binding contract" exception to imposition of the tax. The IRS's position is that the no contract for purchase existed until August 30, 1991 when Mr. Barto paid his full purchase price and received his new car from Estate Motors.

Thus, as indicated above, resolution of this case involves the very narrow issue of whether there was a binding contract for the purchase of Barto's Mercedes in existence as of September 30, 1990 within the meaning of the "binding contract" exception of Pub.L. 101–508.

## DISCUSSION

As noted above in this Opinion and Order, this case calls for application of the November 1990 OBRA amendments to the Internal Revenue Code set forth in Pub.L. 101–508, now codified at 26 U.S.C. § 4001 *et seq.*

New section 4001(a) of the Code, which was added by the November 1990 amendments, provides in pertinent part as follows:

(a) **Imposition of tax.**—There is hereby imposed on the 1st retail sale of any passenger vehicle a tax equal to 10 percent of the price for which so sold to the extent such price exceeds $30,000.

26 U.S.C. § 4001(a).

In enacting the November 1990 amendments, Congress carved out a narrow exception to imposition of the new "luxury tax". Section 11221(f) of Pub.L. 101–508 provided, in pertinent part, as follows:

(1) **In general.**—The amendments made by this section [enacting sections 4001 to 4012 of Title 26] ... shall take effect on January 1, 1991.

(2) **Exceptions for binding contracts.**—In determining whether any tax imposed [by these amendments] applies to any sale after December 31, 1990, *there shall not be taken into account the amount paid for any article (or part or accessory therefor) if the purchaser held on September 30, 1990, a contract (which was binding on such date and at all times thereafter before the purchase) for the purchase of such article (or part or accessory.)*

26 U.S.C. § 4001, Historical and Statutory Notes (emphasis added).

As discussed above, Plaintiff contends that he had a binding contract for the purchase of his new 1991 Mercedes–Benz 500SL as of February 22, 1990, i.e., more than seven months before the deadline set forth in the "binding contracts" exception of Pub.L. 101–508.

The IRS takes the position that no contract was created by the February 21–22, 1990 documents and transactions. The IRS advances three arguments in support of its "no binding contract" contention.

First, the IRS argues that no contract was created by the February 1990 documents and transactions because no price for the car was specified or agreed upon, and the $500 paid by Mr. Barto at the time was grossly inadequate consideration for the Mercedes. Thus, the IRS argues that the February 1990 documents and transactions must be determined to not constitute a "binding contract" for the purchase of the Mercedes due to indefiniteness and lack of consideration.

In making the foregoing argument, however, the IRS relies solely upon traditional common law elements of an enforceable "contract". In so doing, the IRS ignores the fact that in this case we are dealing with a transaction for *the sale of goods,* and thus, the law to be applied to determine whether an enforceable, binding contract was created by the February 1990 documents and transactions is the *Uniform Commercial Code.* M.C.L. § 440.2101 *et seq.* (referred to herein as the "UCC").

Section 2–201 of the UCC sets for the formal requirements of an enforceable contract for the sale of goods. Under § 2–201 all that is required to establish an enforceable contract for the sale of goods costing $500 or more is "some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or his authorized agent or broker." M.C.L. § 440.2201(1).

 The Official U.C.C. Comment to Section 2–201 makes it clear that the absence of a price term—which is what the IRS relies

upon in making its indefiniteness/inadequate consideration argument—*does not render an agreement covered by the UCC unenforceable.* The commentators explained:

1. The required writing need not contain all the material terms of the contract.... The only term which must appear is the quantity term.... *The price, time, and place of payment or delivery, the general quality of the goods, or any particular warranties may all be omitted.*

*Special emphasis must be placed on the permissibility of omitting the price term....* In many valid contracts for sale the parties do not mention the price in express terms, the buyer being bound to pay and the seller being bound to accept a reasonable price.... Again, frequently the price is not mentioned since the parties have based their agreement on a price list or catalogue known to both of them.... Finally, "market" prices and valuations that are current in the vicinity constitute a similar check. Thus, if the price is not stated in the memorandum it can normally be supplied without danger of fraud....

M.C.L. § 440.2201, Official U.C.C. Comment, Subd. 1 (emphasis added.)

UCC Sections 2–204 and 2–305 further make it clear that the absence of a price for the Mercedes ordered by Mr. Barto in the February 1990 documents is not a legal basis for contending that due to "indefiniteness" no binding contract existed.

Subsection (3) of Section 2–204 provides: *Even though one or more terms are left open a contract for sale does not fail for indefiniteness* if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

M.C.L. § 440.2204(3) (emphasis added.)

Section 2–305 expressly provides that "if nothing is said as to price", the price will be "a reasonable price at the time for delivery." M.C.L. § 440.2305(1)(a).

■ With respect to this case, Mr. Barto testified in his deposition that he understood

as of the time of the February 21–22, 1990 transactions that his $500 check was only a deposit and that he would be required to pay the "sticker" price of the car when it was delivered 18 months later. Under these circumstances, and by application of the above-quoted UCC provisions, it is clear to the Court that the IRS's "indefiniteness/inadequate consideration" argument is completely without merit.

The IRS's second argument is that the parties did not intend that a contract be formed by the Retail Buyer's Order form because the statement "THIS ORDER IS NOT A BINDING CONTRACT" is printed on the bottom of the form executed by Mr. Barto and the Estate Motors salesman on February 21, 1990. While the Order itself may, indeed, be no more than an "offer to purchase" [7], and not a "contract", the IRS ignores the fact that under the UCC an "Order" (i.e., "offer to purchase") can be "accepted" by any reasonable manner, thereby creating a binding contract upon its acceptance.

UCC Section 2–206 provides:

(1) Unless otherwise unambiguously indicated by the language or the circumstances

(a) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances....

M.C.L. § 440.2206(1)(a).

The Official Comment to Section 2–206 explains that "the beginning of performance by an offeree [here, Estate Motors] *can be effective as acceptance.*" *See also, Komraus Plumbing & Heating v. Cadillac Sands Motel,* 387 Mich. 285, 289, 195 N.W.2d 865 (1972). Furthermore, it is not necessary that the offer and acceptance be simultaneous. *See Challenge Machinery Co. v. Mattison Machine Works,* 138 Mich.App. 15, 359 N.W.2d 232 (1984) (acceptance of offer two days later established binding contract). *See also, Smith v. Doughty,* 227 Mich. 638, 199 N.W. 663 (1924) (same effect under pre-UCC Michigan common law).

---

7. As a general rule, orders are considered "offers to purchase." *See, Aaron E. Levine & Co. v.* *Calkraft Paper Co.,* 429 F.Supp. 1039 (E.D.Mich. 1976)

In this case, the Court finds that Estate Motors "accepted" Mr. Barto's "offer to purchase" as set forth in the Retail Buyer's Order form the day after the Order form was executed. Proof of "acceptance" is Estate Motors placement of the order for Mr. Barto's Mercedes–Benz as evidenced by the Advance Production Reservation Request signed by the Dealer, and the Dealer's subsequent cashing of Mr. Barto's $500 check. Therefore, the IRS's argument that the Retail Buyer's Order form *in and of itself* is not a binding contract is irrelevant; a binding contract was created by Estate Motors' subsequent acceptance by beginning performance.[8]

*Thomaier v. Hoffman Chevrolet, Inc.*, 64 App.Div.2d 492, 410 N.Y.S.2d 645, 25 U.C.C.Rep.Serv. 44 (1978), a case cited by Plaintiff in his summary judgment brief, presented circumstances virtually identical to those presented in this case. In *Thomaier*, the court found that a contract for the sale of a specifically optioned Limited Edition Corvette was formed as a matter of law no later than the time when the dealer, after having taken and retained the plaintiff-purchaser's $1,000 deposit, placed an order signed by it for the identical vehicle with the manufacturer. Inasmuch as the New York version of the UCC is identical to Michigan's version, this Court finds *Thomaier* persuasive authority.[9]

The IRS's last argument is that no contract binding upon Mr. Barto existed because Mr. Barto testified in his deposition that he subjectively believed that he thought he could "walk away" from the February 1990 agreement at any time and get his $500 deposit back. An examination of the deposition testimony relied upon by the IRS, however, does not indicate that Mr. Barto did not believe that a binding contract was created when he and the dealer executed the February 1990 documents. Rather, it appears that Mr. Barto's belief was that the dealer would probably have excused him from performing his end of the agreement, if he so requested.

Mr. Barto testified that he thought he could walk away from the deal at any time because of the high demand and limited production of the particular model of Mercedes–Benz he had ordered. He stated that he knew the dealer had a waiting list of people who wanted 500SLs, and when Estate Motors unexpectedly received three extra cars on the same day that Mr. Barto's car came in and the salesman told him that the Dealer was able to sell all three within a matter of hours. However, this testimony does not establish that Mr. Barto and the dealer did not intend to create a binding agreement when they executed the 1990 documents.[10]

Furthermore, the IRS's reliance upon Mr. Barto's subjective belief that he probably would be permitted to walk away from the deal for the proposition that Barto did not intend that a binding contract be created in 1990 ignores his contradictory testimony that he believed that he had a binding "contract" for the purchase of the Mercedes he ordered:

8. It is by virtue of Estate Motors' acceptance by beginning performance on February 22, 1990 that the Court finds the absence of the signature of the Dealer (or Authorized Representative of the Dealer), to be of no consequence. In addition to Section 2–206, the Comment to Section 2–201 makes clear that "partial performance" may substitute to validate the contract. In this case, although the Dealer did not sign the Retail Buyer's Order form, on the day after Mr. Barto and the salesman, Doug MacFarlane executed that form, the Dealer at least "partially performed" by placing an order for Mr. Barto's choice of car with the manufacturer as evidenced by the Advance Production Reservation Request form signed by the Dealer.

9. The IRS attempts to distinguish *Thomaier* on the basis that in that case, the order form executed by the plaintiff-purchaser stated the precise purchase price of the car ordered but in this case, no price was stated, therefore, the IRS contends that the "contract" was void for indefiniteness. As discussed above in the text of this Opinion and Order, however, under the UCC, the absence of a price does *not* void a contract for the sale of goods for indefiniteness. For this reason, the Court finds no merit in the IRS's argument against application of the *Thomaier* case.

10. The IRS's argument is further weakened by the fact that on the reverse side of the Retail Buyer's Order form are a number of provisions setting forth the precise circumstances under which the purchaser and the dealer would be excused from performing their respective ends of the agreement.

Q: Going back to the period between February of 1990 and August of '91 if for whatever reason Estate had not been able—Estate Motors had not been able to deliver the car what would happen with regard would you—what was your understanding in what would happen?

A: If they took that order and told me that they couldn't deliver the car I probably would have gone after them legally.

Q: For what?

A: To deliver me a car, they could get a car * * * They could probably go around to another dealer and work a trade or something, I mean, it would be a matter of time but they would have to fulfill the order. * * * I mean, to me, it was a contract.

Q: Did anyone from Estate Motors ever tell you that if they were not able to deliver the car they wouldn't have to give you the car—

A: No.

Q: —and just give you the $500 back?

A: No.

[Barto Dep.Tr. pp. 77–79.]

More importantly, even assuming *arguendo* that Mr. Barto's may have subjectively believed that the dealer would have excused him from performing his end of the February 1990 agreement, that subjective belief is immaterial. Mr. Barto is not a lawyer, therefore, his opinion as to whether or not he would be obligated to pay for and accept the

Mercedes–Benz when it arrived is irrelevant. Furthermore, Mr. Barto admitted in his deposition *that no one at Estate Motors ever told him that he would not be contractually bound to pay for and accept the Mercedes when it came in.* [Barto Dep.Tr. pp. 88–89.] [11]

■ Under Michigan law, Mr. Barto *was* legally obligated to perform his side of the bargain, notwithstanding his subjective belief regarding excuse of performance. In Michigan, it is recognized that under the UCC, an implied obligation is imposed upon a purchaser to accept and pay for ordered goods even though such an obligation is not expressed in the forms signed by the parties to the contract. *See Michigan Bean Company v. Senn,* 93 Mich.App. 440, 445, 287 N.W.2d 257, 260 (1979); M.C.L. § 440.2301.

The Court further notes that both Estate Motors and Mr. Barto treated their February 1990 agreement as binding during the 18 months prior to the actual "purchase" of the car in August 1991. Estate Motors ordered the car that Mr. Barto wanted immediately after he placed his order and delivered the vehicle to him as obligated under the agreement. Mr. Barto asked the dealer for updates regarding delivery of the car during the months prior to its arrival at the dealership. And, when the Mercedes came in, Mr. Barto accepted the vehicle paying the price demanded.

---

11. The IRS wants the Court to focus on Mr. Barto's belief about being able to walk away from the agreement because it is taking the position that, even if the dealer was obligated to perform the contract (i.e., to get him a car), Mr. Barto's belief indicates that he was not obligated to perform his end of the deal (i.e., to ultimately buy the car). The IRS makes this argument because there is language in the Conference Report of Pub.L. 101–508 stating that the new luxury tax does not apply "to an article purchased pursuant to a contract *that was binding on the purchaser* on September 30, 1990 and at all times thereafter and before January 1, 1991." Pub.L. 101–508, Conference Report, 1990, reprinted at P40,011 CCH at 1039.

The Court notes that the Conference Report language did *not* make its way into the bill actually adopted. The specific language adopted was that the tax is not to apply "if the purchaser held on September 30, 1990 a contract which was

binding on such date and at all times thereafter before the purchase." Pub.L. 101–508, § 11221(f).

It is a fundamental tenet of statutory construction that a court is only to look to the Legislative History if the meaning of a provision cannot be determined from the "plain language" of the statute. The Court finds no ambiguity in the plain language of the statute at issue. Moreover, even if the Court were to accept the IRS's reliance on the Conference Report "binding on the purchaser" language, as indicated in the text of this Opinion and Order, the Court finds that an enforceable contract, binding on *both* parties—Estate Motors *and* Robert Barto—existed at all times after February 22, 1990. Mr. Barto's subjective belief of being excused from performing is irrelevant. Therefore, even under the Conference Report's definition of "binding on the purchaser" the binding contract exception applies.

Simply stated, there is no sufficient, competent evidentiary support for the IRS's arguments for entry of summary judgment in its favor. Rather, all of the objective evidence in this case and all relevant law support Plaintiff's position. Mr. Barto's offer to purchase the Mercedes in question was made when he executed the Retail Buyer's Order form on February 21, 1990. Estate Motors accepted Barto's offer when it took his check and placed an order for a car with his requested specifications with the manufacturer on February 22, 1990 as evidenced by the dealer's execution of the Advance Production Reservation Request. Thus, a binding contract, supported by the mutual promises to buy and sell the Mercedes–Benz in question, came into existence no later than February 22, 1990 and continued in existence at all times thereafter culminating in the deliver of the vehicle to Mr. Barto and his contemporaneous payment of the full price of the car to Estate Motors.

## CONCLUSION

For all of the foregoing reasons, the Court finds that Mr. Barto held a binding contract for the purchase of the subject Mercedes–Benz 500SL on September 30, 1990 and at all times thereafter before delivery of the vehicle to him and his payment of the purchase price therefor on August 30, 1991. Therefore, the Court finds that Mr. Barto should not have been assessed the $6,995.00 luxury tax, and having paid that tax, he is entitled to a refund of that sum.

Accordingly,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment be, and hereby is, GRANTED and Defendant's Cross-motion for Summary Judgment is hereby DENIED.

Let Judgment be entered accordingly.