*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0287p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

NATIONAL SURETY CORPORATION,
　　　　　　　　　　　　　*Plaintiff-Appellant.*

　　*v.*

No. 06-6168

HARTFORD CASUALTY INSURANCE COMPANY,
　　　　　　　　　　　　　Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 05-00119—Charles R. Simpson III, District Judge.

Argued: May 31, 2007

Decided and Filed: July 30, 2007

Before: RYAN, DAUGHTREY, and ROGERS, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Barry M. Miller, FOWLER, MEASLE & BELL, Lexington, Kentucky, for Appellant. Douglas L. Hoots, LANDRUM & SHOUSE, Lexington, Kentucky, for Appellee. **ON BRIEF:** Barry M. Miller, FOWLER, MEASLE & BELL, Lexington, Kentucky, for Appellant. Douglas L. Hoots, LANDRUM & SHOUSE, Lexington, Kentucky, for Appellee.

———————————

**OPINION**

———————————

　　ROGERS, Circuit Judge. When a primary insurer against tort liability refuses to settle and then loses at trial for amounts greater than its coverage limits, what recourse does an excess insurer have against the primary insurer? This case involves the issue of whether, under Kentucky law, an excess insurer can recover against a primary insurer pursuant to the doctrine of equitable subrogation, either for the primary insurer's failure in good faith to settle a claim or for the primary insurer's failure to investigate whether an insured has other insurance.

　　The excess insurer in this case, National Surety Corporation, argues that the primary insurer, Hartford Casualty Insurance Company, acted in bad faith by failing to settle a tort claim against their

1

mutual insured, Sufix U.S.A., and thereby exposed Sufix to excess liability.[1] National Surety seeks to step into Sufix's shoes, pursuant to the doctrine of equitable subrogation, to assert this bad-faith claim. National Surety also seeks to assert a claim against Hartford for Hartford's failure to discover that Sufix was insured by National Surety. The district court held that National Surety did not have a cause of action under Kentucky law, and accordingly granted Hartford's motion to dismiss.

We reverse the district court's order because the Supreme Court of Kentucky would likely recognize a cause of action in this case. Kentucky law already permits an insured to sue a primary insurer for bad faith failure to settle a claim. Kentucky law also recognizes the doctrine of equitable subrogation, which permits an insurance company to "step into the shoes" of the insured and recover what the insured would have been able to recover against a tortfeasor. Combining these two principles to allow an excess insurer to recover from a primary insurer is a logical extension of these principles and furthers Kentucky's policy goals of encouraging fair and reasonable settlements and preventing third parties from profiting from an insured's insurance coverage. However, the district court's order properly dismissed National Surety's failure-to-investigate claim because an insured does not have a cause of action under Kentucky law against its insurer for failing to discover an insured's other sources of insurance.

National Surety's complaint alleges the following facts, which this court must accept as true, *Evans v. Pearson Enters., Inc.*, 434 F.3d 839, 847 (6th Cir. 2006). Hartford and National Surety both issued insurance policies to Sufix U.S.A. Hartford's policy provided $1 million in primary liability coverage and National Surety's policy provided $10 million in excess liability coverage. On or about May 19, 1998, a weed trimmer manufactured by Sufix injured Tommy Cook when the trimmer broke apart while Cook was using it.

In May of 1999, Cook filed suit against Sufix in Jefferson Circuit Court, alleging that the weed trimmer was defectively designed and that Sufix was grossly negligent in failing to discover the defect. Hartford assumed the defense of Sufix pursuant to its insurance contract. Hartford, through its attorneys, engaged in settlement negotiations with Cook, and ultimately rejected Cook's offer to settle for the limits of Hartford's policy (i.e., $1 million).

National Surety did not receive notice of Cook's action against Sufix from Sufix or Hartford until approximately two weeks before trial. National Surety alleges that because of the lack of timely notice, it was (1) unable to evaluate effectively its exposure to Cook under the excess policy, (2) unable to evaluate Cook's settlement demand, (3) not given the opportunity to participate in or direct the preparations for the trial, and (4) unable to engage in informed settlement negotiations with Cook.

On May 21, 2002, a jury found Sufix liable to Cook and awarded Cook $6,486,588.44. After the trial, National Surety assumed the defense of Sufix and brought an unsuccessful appeal to the Court of Appeals of Kentucky.

On February 24, 2005, National Surety filed suit against Hartford in the United States District Court for the Western District of Kentucky. National Surety sued Hartford for breach of contract and for violation of the common-law duty of good faith. National Surety asserted in its complaint that Hartford failed "[t]o perform an adequate investigation of the allegations that form the basis of the Civil Action," failed "[t]o provide Sufix with an adequate and competent defense of the allegations contained in the Civil Action," and failed "[t]o settle claims against Sufix within

---

[1] A primary insurer insures against liability risk from $0 up to the policy limits. An excess insurer insures against liability above the limits of primary insurance. For example, here, the insured had a primary insurance policy with Hartford that covered liability up to $1 million and an excess insurance policy with National Surety that covered any liability above $1 million, up to $10 million.

its policy limits so as not to expose Sufix and its assets to an excess judgment." National Surety claimed that it is subrogated to Sufix pursuant to the terms of the excess policy and the doctrine of equitable subrogation. Hartford filed a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that Kentucky does not recognize the right of excess insurers to sue primary insurers in a situation like this one.

The district court granted Hartford's motion to dismiss. *Nat'l Sur. Corp. v. Hartford Cas. Ins. Co.*, 445 F. Supp. 2d 779 (W.D. Ky. 2006). The district court predicted that the Kentucky Supreme Court would not recognize a cause of action by an excess insurer against a primary insurer pursuant to the doctrine of equitable subrogation, even though such a rule had been adopted by the overwhelming majority of jurisdictions to have considered the issue. *Id.* at 781-85. First, the district court observed that "the Kentucky Court of Appeals refused to recognize the theory of equitable subrogation in a similar situation," where an excess insurer sought to sue an insured's defense counsel for malpractice. *Id.* at 781 (referring to *Am. Cont'l Ins. Co. v. Weber & Rose, P.S.C.*, 997 S.W.2d 12 (Ky. Ct. App. 1998)). The court noted that *Weber & Rose* "is the strongest indicator of how the Kentucky courts would rule in the case at bar." *Id.* The court reasoned that, as in *Weber & Rose*, allowing recovery against the primary insurer would "threaten the integrity of the settlement process by allowing the excess carriers, who were not involved in those underlying negotiations, to second-guess the judgment of the primary insurer's representatives." *Id.* at 782.

Second, the district court concluded that Kentucky would not follow the jurisdictions that have adopted the rule advocated by National Surety because excess insurers do not suffer an injury when a primary insurer, in bad faith, fails to settle a claim within its policy limits. *Id.* at 782-83. The district court reasoned that the excess insurer, National Surety, has received a premium in exchange for assuming the risk of an excess judgment and therefore suffered no wrong, while the insured, Sufix, who has been fully indemnified, has suffered no loss. *Id.* at 783. The district court supported this reasoning with several hypotheticals. *Id.* at 783-85. Finally, the district court refuted the argument that failing to adopt the majority rule would raise excess insurance premium costs by raising the countervailing likelihood that adopting the majority rule would raise primary insurance premiums, thereby ultimately distributing costs unfairly. *Id.* at 785.

In resolving an issue of state law in a diversity case, this court must "'make [the] best prediction, even in the absence of direct state court precedent, of what the Kentucky Supreme Court would do if it were confronted with'" the same question of law. *Managed Health Care Assocs., Inc. v. Kethan*, 209 F.3d 923, 927 (6th Cir. 2000) (quoting *Welsh v. United States*, 844 F.2d 1239, 1245 (6th Cir. 1988)). Because Kentucky law and policy support the majority rule that an excess insurer may recover against a primary insurer under the doctrine of equitable subrogation, and arguments to the contrary are not persuasive, the Kentucky Supreme Court would likely recognize the rule asserted by National Surety in this case.

The Kentucky Supreme Court would likely adopt the majority rule because that rule naturally follows from two other Kentucky insurance rules: (1) that an insured may sue an insurer who, in bad faith, fails to settle a claim within policy limits, and (2) that an insurer may step into the shoes of the insured, pursuant to the doctrine of equitable subrogation. In addition, the majority rule furthers Kentucky policies of encouraging fair and reasonable settlements and preventing wrongdoers from piggybacking on an insured's insurance.

Kentucky law permits an insured to sue a primary insurer that, in bad faith, fails to settle a claim. Under Kentucky law, the insurance contract between an insured and insurer contains an implied covenant of good faith and fair dealing. *Manchester Ins. & Indem. Co. v. Grundy*, 531 S.W.2d 493, 498 (Ky. 1975). The insured has a cause of action against the insurer if the insurer, in bad faith, fails to settle a claim within the policy limits. *Id.* at 497-98. Kentucky follows the general rule that "damages recoverable for a wrong are not diminished by the fact that the injured party has

been wholly or partly indemnified for his loss by insurance (to whose procurement the wrongdoer did not contribute)." *Taylor v. Jennison*, 335 S.W.2d 902, 903 (Ky. 1960). In the instant case, even though Sufix had excess insurance, and thus was compensated for the entire verdict against it, Sufix still had a cause of action against Hartford.

Kentucky also recognizes the doctrine of equitable subrogation. Although Kentucky courts note that equitable subrogation "should be strictly limited in its application," *United Pac. Ins. Co. v. First Nat'l Bank of Prestonsburg*, 457 S.W.2d 833, 835 (Ky. 1970), the courts recognize that equitable subrogation "has a long and rich tradition of benevolence and fairness, . . . and is irrevocably anchored in principles of natural justice." *Wine v. Globe Am. Cas. Co.*, 917 S.W.2d 558, 561 (Ky. 1996) (citations omitted). Equitable subrogation is "designed to prevent unjust enrichment by requiring those who benefitted from another paying their debt to ultimately pay it themselves." *Id.* The rule, as applied in the insurance context, allows an insurer to sue a third party for injuries that the third party caused to the insured, when the insurer compensated the insured for those injuries. *See, e.g.*, *Employers Mut. Liability Ins. Co. v. Griffin Constr. Co.*, 280 S.W.2d 179, 182 (Ky. 1955); *Ohio Cas. Ins. Co. v. Vermeer Mfg. Co.*, 298 F. Supp. 2d 575, 579-80 (W.D. Ky. 2004). For example, if *A* negligently runs over *B* with his car, *B*'s insurer can sue *A* if *B*'s insurer compensated *B* for her injuries.

Considering these two principles together leads to the conclusion that an excess insurer is permitted to step into the shoes of the insured and sue a primary insurer pursuant to the doctrine of equitable subrogation to enforce the primary insurer's duty to avoid excessive judgments against an insured. The overwhelming majority of jurisdictions that have considered the issue in this case have adopted such a rule.[2] Only Alabama and Idaho adhere to the minority position. *See Fed. Ins. Co. v. Travelers Cas. & Sur. Co.*, 843 So.2d 140, 145-46 (Ala. 2002); *Stonewall Surplus Lines Ins. Co. v. Farmers Ins. Co. of Idaho*, 971 P.2d 1142, 1148-49 (Idaho 1998).

The majority rule encourages the fair and reasonable settlement of lawsuits. *See, e.g.*, *Am. Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 482-83 (Tex. 1992). Absent a rule permitting excess insurers to recover against primary insurers, primary insurers could, in bad faith, fail to accept settlement offers at or near policy limits with impunity. The Supreme Court of

---

[2]*See Hartford Accident & Indem. Co. v. Aetna Cas. & Sur. Co.*, 792 P.2d 749, 754 (Ariz. 1990); *Commercial Union Assurance Cos. v. Safeway Stores, Inc.*, 610 P.2d 1038, 1041 (Cal. 1980); *Ranger Ins. Co. v. Travelers Indem. Co.*, 389 So.2d 272, 273 (Fla. Dist. Ct. App. 1980); *Home Ins. Co. v. N. River Ins. Co.*, 385 S.E.2d 736, 740 (Ga. Ct. App. 1989); *Certain Underwriters of Lloyd's v. Gen. Accident Ins. Co. of Am.*, 909 F.2d 228, 233 (7th Cir. 1990) (applying Indiana law); *Ins. Co. of N. Am. v. Med. Protective Co.*, 768 F.2d 315, 320-21 (10th Cir. 1985) (applying Kansas law); *Great Sw. Fire Ins. Co. v. CNA Ins. Cos.*, 557 So.2d 966, 967 (La. 1990); *Fireman's Fund Ins. Co. v. Cont'l Ins. Co.*, 519 A.2d 202, 205 (Md. 1987); *Hartford Cas. Ins. Co. v. N.H. Ins. Co.*, 628 N.E.2d 14, 15 (Mass. 1994); *Commercial Union Ins. Co. v. Medical Protective Co.*, 393 N.W.2d 479, 483 (Mich. 1986); *Cont'l Cas. Co. v. Reserve Ins. Co.*, 238 N.W.2d 862, 864 (Minn. 1976); *Estate of Penn v. Amalgamated Gen. Agencies*, 372 A.2d 1124, 1126-27 (N.J. Super. Ct. App. Div. 1977); *Hartford Accident & Indem. Co. v. Mich. Mut. Ins. Co.*, 463 N.E.2d 608, 610 (N.Y. 1984); *Centennial Ins. Co. v. Liberty Mut. Ins. Co.*, 404 N.E.2d 759, 762 (Ohio 1980); *Am. Fidelity & Cas. Co. v. All Am. Bus Lines*, 190 F.2d 234, 238 (10th Cir. 1951) (applying Oklahoma law); *Me. Bonding & Cas. Co. v. Centennial Ins. Co.*, 693 P.2d 1296, 1300 (Or. 1985); *Greater N.Y. Mut. Ins. Co. v. N. River Ins. Co.*, 85 F.3d 1088, 1094 (3d Cir. 1996) (applying Pennsylvania law); *N. River Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 600 F.2d 721, 723-24 nn.3&4 (8th Cir. 1979) (applying South Dakota law); *Am. Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 482-83 (Tex. 1992); *Prime Hospitality Corp. v. Gen. Star Indem. Co.*, No. CIV.1997-91, 1999 WL 293865, at *4 n.10 (D. V.I. Apr. 29, 1999) (unpublished); *Truck Ins. Exch. of the Farmers Ins. Group v. Century Indem. Co.*, 887 P.2d 455, 459-60 (Wash. Ct. App. 1995); *Vencill v. Cont'l Cas. Co.*, 433 F. Supp. 1371, 1376 (S.D. W. Va. 1977) (applying West Virginia law); *see also Twin City Fire Ins. Co. v. Country Mut. Ins. Co.*, 23 F.3d 1175, 1178-79 (7th Cir. 1994) (applying Illinois law and endorsing majority rule) *Allstate Ins. Co. v. Reserve Ins. Co.*, 373 A.2d 339, 340 (N.H. 1977) (permitting excess insurer to sue primary insurer under assignment theory); *Elec. Ins. Co. v. Nationwide Mut. Ins. Co.*, 384 F. Supp. 2d 1190, 1193 (W.D. Tenn. 2005) (applying Tennessee law; denying motion to dismiss); *Horace Mann Ins. Co. v. Gov't Employees Ins. Co.*, 344 S.E.2d 906, 908 (Va. 1986) (assuming without deciding); *Hocker v. N.H. Ins. Co.*, 922 F.2d 1476, 1485 (10th Cir. 1991) (applying Wyoming law; assuming in dicta).

Michigan, for instance, reasoned that the majority rule "discourag[es] primary carriers from 'gambling' with the excess carrier's money when potential judgments approach the primary insurer's policy limits." *Commercial Union Ins. Co. v. Medical Protective Co.*, 393 N.W.2d 479, 483 (Mich. 1986). For example, suppose in this case that Hartford estimated that, if Cook's case against Sufix went to trial, there was a 50% chance that Cook would lose, and a 50% chance that Cook would win a jury verdict of $5.5 million. The weighted expectation of liability for going to trial would have been $2.25 million (50% x $5.5 million + 50% x $0) and Cook's settlement offer of $1 million would have been a great bargain. However, Hartford would have had to pay only $1 million if Cook won and $0 if Cook lost, for a weighted expectation of liability on Hartford's part of $500,000 (50% x $1 million + 50% x $0). Thus, it would have been in Hartford's best interest to go to trial because the economic risk of going to trial did not fall completely on Hartford.[3] Therefore, in the absence of the majority rule, there is a potential that a primary insurer will forgo fair and reasonable settlements and roll the dice with, what is in essence, the excess insurer's money.

Such hypotheticals cannot be disposed of with the observation that they fail to take into account the litigation costs incurred by the insurer when the case goes to trial. Although the presence of litigation costs diminishes the incentive an insurer has to go to trial, the underlying problem still remains. For example, in the above hypothetical, suppose that if the case went to trial, Hartford would have incurred $100,000 in litigation costs. Then the total weighted expected cost of going to trial would have been $2.35 million. But Hartford would have had to pay $1.1 million if Cook won and $100,000 if Cook lost, for a weighted expected cost of $600,000. Thus, it still would have been in Hartford's interest to go to trial.

Similarly, Kentucky law values the fair and reasonable settlement of lawsuits. The Kentucky courts have repeatedly stated that "[t]he law always looks with favor upon an agreement between two or more persons who, to avoid a lawsuit, amicably settle their differences on such terms as to them seem fair and reasonable." *Dexter v. Duncan*, 265 S.W. 832, 832 (Ky. 1924); *accord Childs v. Hamilton*, 214 S.W.2d 106, 108 (Ky. 1948). This principle also applies in the insurance context. For example, Kentucky's Unfair Claims Settlement Practices Act prohibits persons in the business of entering into insurance contracts from "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonable clear." Ky. Rev. Stat. Ann. § 304.12-230(6) (LexisNexis 2006).

In addition, the majority rule's goal of preventing a primary insurer from, in bad faith, failing to settle a claim comports with Kentucky's insurance policy goals. As discussed above, a primary insurer has an incentive to fail to settle a claim within its policy limits even though the settlement offer is objectively fair and reasonable. Although the insured has a cause of action against a primary insurer who fails to settle in good faith, when the insured has excess insurance, the insured has little incentive to sue because the harm of the primary insurer's refusal to settle falls completely on the

---

[3]Judge Posner used a similar hypothetical in explaining the Seventh Circuit's anticipation of Illinois law on the subject:

> Suppose the claim was for $2 million, the policy limit was $1 million, the plaintiff was willing to settle for this amount, but the defendant's insurer believed that if the case was tried the plaintiff would have a 50 percent chance of winning $2 million and a 50 percent chance of losing. The insurer's incentive would be to refuse to settle, since if it lost the trial it would be no worse off than if it settled—in either case it would have to pay $1 million—but if it won it would have saved itself $1 million. It is in order to quench this kind of temptation that the liability insurer's duty to settle in good faith was read into liability insurance contracts. When by virtue of an excess insurance policy the victim of the behavior that we have described is the excess insurer rather than the insured, the former is permitted to step into the shoes of the latter and assert the latter's implied contractual right against the misbehaving insurer.

*Twin City Fire Ins. Co. v. Country Mut. Ins. Co.*, 23 F.3d 1175, 1179 (7th Cir. 1994).

excess insurer. *See, e.g.*, *Twin City Fire Ins. Co.*, 23 F.3d at 1179. The reason why Kentucky law permits an insured to sue a wrongdoer despite the fact that the insured is indemnified for his loss is because "there is no logical or legal reason why a wrongdoer should receive the benefit of insurance obtained by the injured party for his own protection." *Taylor*, 335 S.W.2d at 903. This policy applies as strongly when an insured has excess insurance and favors adoption of the majority rule because otherwise a wrongdoer (the primary insurer who fails to settle in good faith) would receive the benefit of the insured's excess insurance.

Adopting the rule that excess insurers can sue primary insurers in cases like this does not, as argued, conflict with the Kentucky Court of Appeals' decision in *American Continental Insurance Co. v. Weber & Rose, P.S.C.*, 997 S.W.2d 12 (Ky. Ct. App. 1998). In *Weber & Rose*, the Kentucky Court of Appeals held that an excess insurer cannot sue an insured's *defense counsel for malpractice* under the theory of equitable subordination, relying on the Kentucky courts' "clearly-defined duty to protect, encourage, and preserve the traditional attorney-client relationship." 997 S.W.2d at 14. Permitting such suits "would be inimical to the preservation of traditional and longstanding concepts associated with attorney-client relationship, as recognized by Kentucky law." *Id.* at 13. Assuming that the Kentucky Supreme Court would agree with the Court of Appeals, that holding does not foreclose the possibility that the Kentucky Supreme Court would permit excess insurers to sue primary insurers for breach of their good faith obligation to insureds. The latter obligation is one that is outside of the attorney-client relationship, which was the central basis for the Court of Appeals holding in *Weber & Rose*. Also, other jurisdictions have permitted these two rules to coexist. *See St. Paul Ins. Co. v. AFIA Worldwide Ins. Co.*, 937 F.2d 274, 279, 281 (5th Cir. 1991) (holding that although Louisiana law permitted an excess insurer to sue a primary insurer under a subrogation theory, Louisiana law did not permit the excess insurer to sue the insured's counsel); *Am. Employers' Ins. Co. v. Med. Protective Co.*, 419 N.W.2d 447, 448 (Mich. Ct. App. 1988) (holding that an excess insurer could not sue an insured's defense attorney for legal malpractice under the doctrine of equitable subrogation, notwithstanding the fact that Michigan permitted excess insurers to bring bad-faith-failure-to-defend-or-settle claims against primary insurers), *abrogated by Atlanta Int'l Ins. Co. v. Bell*, 475 N.W.2d 294, 298-99 (Mich. 1991) (permitting excess insurer to sue defense attorney). There is no reason why the Kentucky Supreme Court would fail to impose a duty upon primary insurers in this case in light of the Kentucky policy reasons in favor of such a duty.

Other concerns with adoption of the majority rule do not, in the end, provide persuasive reasons for Kentucky to reject it. It is not enough to say, for instance, that an excess insurer's premiums reflect the possibility that a primary insurer would, in bad faith, fail to settle a claim. Such an argument proves too much: it would do away with equitable subrogation altogether in the insurance context. For example, a health insurance company will pay for hospital bills covering injuries that an insured suffers by reason of a third party's negligence. The health insurance company may sue the third-party tortfeasor, under the doctrine of equitable subrogation, to recover the damages owed to the insured that the insurer covered, and only circular reasoning would preclude such subrogation on the theory that the insurance company's premiums reflect the possibility of tortiously inflicted injuries. Like any business, an insurer will factor many risks of loss into the cost of its goods (i.e., insurance premiums), but that does not mean that the insurer must absorb the costs when those risks come to fruition if a third party's negligence or bad faith caused the insurer to suffer those costs. Moreover, from the perspective of the primary insurer, the primary insurer's premiums reflect its duty to settle in good faith, and failing to impose the duty on primary insurers provides them a windfall. *See Centennial Ins. Co.*, 404 N.E.2d at 762.

Nor can it be persuasively argued that the excess insurer does not really "step into the shoes" of the insured because the insured's cause of action against a primary insurer presupposes the lack of excess insurance. As noted above, the insured still has a cause of action under Kentucky law even when the insured's loss is indemnified by insurance. *Taylor*, 335 S.W.2d at 903. *Contrast Fed. Ins.*

*Co.*, 843 So.2d at 144 (noting that in Alabama, the insured does not have a cause of action if the insured suffered no personal loss). In addition, the situation where an insured does not have excess insurance is, in effect, no different from when the insured has excess insurance. When an insured does not have excess insurance, he or she self-insures against the risk of loss above primary insurance limits. The insured, in that case, "pays" for the risk of loss exceeding the primary insurance, but still has a cause of action against the primary insurer for bad faith failure to settle within policy limits.

It could be argued that the interests of the excess insurer and the insured are not truly the same, but we are persuaded by the Seventh Circuit's rejection of the argument:

> It is true that the harm to the insured (when there is no excess insurer) is apt to be even greater than the harm to the excess insurer (when there is one in the picture), because the insured, at least if an individual, will be risk averse—that is why he buys insurance—while the insurance company eliminates risk by pooling the risks of many insureds. But the excess insurer is hurt, nonetheless, if the primary insurer takes steps that increase the probability that the excess insurer will be liable, as in our hypothetical example [*see* n.3, *supra*], where the conduct of the primary insurer converts a zero probability of liability to the excess insurer into a 50 percent probability that the latter will lose $1 million. No court has ever suggested that the difference in attitudes toward risk between an insured and an insurance company should alter the measure of recovery when an excess insurer is subrogated to an insured's claim of bad faith.

*Twin City Fire Ins. Co.*, 23 F.3d at 1179.

Finally, the Kentucky courts are unlikely to reject the majority rule because it might raise premiums for primary insurers. The risk of liability for an insurance company's own bad faith is doubtless included in the cost of primary coverage premiums, just as the cost of committing torts is built into the price of doing business generally. The cost of bad faith refusal to settle is presumably built into the primary insurance premiums where an insured has no excess insurance, and there is no good reason not to have the cost of bad faith refusal to settle included in the premiums for insureds who do have excess insurance. Bad faith costs, in other words, are a cost of doing business. There is no clear economic efficiency derived from shifting them to other insurers who have not acted in bad faith.

National Surety, however, may not assert a claim against Hartford for Hartford's purported failure to investigate whether Sufix had other insurance. Such a claim does not sound in subrogation because Sufix, who presumably knows from whom it has obtained insurance, would have had no such claim against Hartford. Instead, such a claim would presume a direct obligation of the primary insurer to the excess insurer, a concept rejected by most of those jurisdictions accepting subrogation of the primary insurer's obligation to its insured. As the Seventh Circuit said in *Twin City Fire Insurance Co.*, *supra*, "the arguments in favor of the direct duty are not so compelling that we could responsibly predict that the Supreme Court of Illinois would buck the national trend and declare that under the common law of Illinois a primary insurer has a direct duty, actionable in tort, against the excess insurer." 23 F.3d at 1180-81. National Surety concedes that no Kentucky court has recognized a duty of an insurance company to investigate whether an insured has other insurance, but instead points out that two other states do recognize such a duty. *See Cas. Indem. Exch. Ins. Co. v. Liberty Nat'l Fire Ins. Co.*, 902 F. Supp. 1235, 1240 (D. Mont. 1995); *Am. Star Ins. Co. v. Allstate Ins. Co.*, 508 P.2d 244, 249 (Or. 1973). However, neither decision from these states is particularly persuasive and National Surety does not offer any reason why the Kentucky Supreme Court would impose a duty on an insurance company to investigate whether its insured has other insurance

coverage.  Therefore, the district court properly granted Hartford's motion to dismiss with respect to this aspect of its claim.

For the foregoing reasons, we affirm the dismissal of the claim against Hartford to the extent it relied on the failure to investigate whether its insured had other insurance coverage, but otherwise reverse the district court's order granting Hartford's motion to dismiss, and remand for further proceedings consistent with this opinion.