NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0310n.06

No. 24-1436

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

Jun 20, 2025

KELLY L. STEPHENS, Clerk

VERONICA GARDNER; CALVIN MORGAN,

on behalf of themselves and all others similarly situated,

    Plaintiffs-Appellants,

v.

FLAGSTAR BANK, FSB, nka Flagstar Bank, N.A.,

    Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

---

Before: COLE, READLER, and RITZ, Circuit Judges.

**CHAD A. READLER, Circuit Judge.** Veronica Gardner had a checking account with Flagstar Bank, FSB for several years. At issue here are two types of charges Flagstar billed Gardner during that period: (1) an overdraft fee for completed transactions that exceeded her available balance upon the transaction's settlement, but not authorization; and (2) a nonsufficient funds fee assessed each time a merchant unsuccessfully tried to reprocess a transaction that had already been denied.

These charges purportedly caught Gardner off guard. When her complaints to the bank went unresolved, she sued in federal court. Relevant here is her breach of contract claim against Flagstar, on which the district court granted summary judgment to the bank. Because a rational factfinder could conclude that Flagstar breached its contractual terms and conditions, we reverse and remand for further proceedings.

I.

A.  In 2016, Gardner and her husband opened a joint checking account with a Flagstar branch in southeast Michigan.  As part of the account acquisition process, Gardner signed an agreement indicating that she "agree[d] to . . . and acknowledge[d] receipt of," among other documents, Flagstar's Terms and Conditions (the "T&C").  Acct. Agreement, R. 105-18, PageID#2498.  According to her deposition testimony, Gardner "skimmed and briefly read" the T&C. Gardner Dep. Tr., R. 105-3, PageID#2243.  Despite those efforts, Gardner would later incur two types of account fees that she purportedly did not believe Flagstar was authorized to impose.

*Authorize Positive, Settle Negative Transactions.*  One fee is tied to Flagstar's "Bounce Protection Overdraft Privilege Program," in which Gardner was automatically enrolled and did not opt out.  Under the program, Flagstar could approve payments exceeding an accountholder's deposit balance, otherwise known as "overdrafts."  *See Overdraft*, Black's Law Dictionary 1328 (12th ed. 2024) ("A withdrawal of money from a bank in excess of the balance on deposit.").  If the bank approved the transaction, it would also charge a $36 overdraft fee to the account.

In some respects, overdraft fees allegedly came as no surprise to Gardner, based upon her understanding of the T&C.  What she claims to have been unaware of was a particular manifestation of Flagstar's overdraft fees for "authorize positive, settle negative" ("APSN") transactions.

By way of background, when a depositor makes a purchase from a merchant with the depositor's debit card, the merchant may request a "temporary debit authorization hold."  Original T&C, R. 97-1, PageID#1965; Am. T&C, R. 113-5, PageID#3193.  That hold is placed on the depositor's bank account, usually in an amount equal to the purchase's exact value, until the transaction "settles" (typically several days later) and funds are transferred from the depositor's

account to the merchant. In between a transaction's authorization and settlement, the depositor can authorize further intervening debits to his account. If she does so to such an extent that her "available balance" (i.e., the amount of money that can be spent or withdrawn) no longer covers an already-authorized transaction upon its settlement, that transaction is deemed APSN, thereby triggering the $36 fee.

For example, suppose a depositor with a balance of $100 in her bank account swipes her debit card to buy a $50 ticket to a baseball game between her hometown Detroit Tigers and the Minnesota Twins. The merchant, here a ticket seller, requests Flagstar create a temporary debit authorization hold equal to that amount, reducing the depositor's available balance to $50. Next, suppose a $75 check the same depositor wrote to her father is presented to Flagstar for payment. Even though this check now exceeds the depositor's available balance, Flagstar exercises its discretion to pay the instrument, overdrawing the account by $25, plus a $36 overdraft fee. (In other words, the account is now overdrawn by $51.) The next day, the merchant submits its $50 debit card transaction for payment. As before, Flagstar honors the debit-card transaction, disbursing $50 in cash. But as the account remains overdrawn, the bank also charges another $36 overdraft fee. This second overdraft fee qualifies as APSN—that is, the depositor's available balance sufficed for the initial transaction (purchasing baseball tickets) upon its authorization, but not its settlement. By that point, as explained, the account was overdrawn.

Gardner alleges to have incurred these types of overdraft fees numerous times. For today's purposes, only two transactions are relevant: a $26.01 charge to Leo's Coney Island and a $10.04 charge to McDonald's, both of which settled in September 2016, and each of which incurred $36 fees.

*Re-Presentment Fees.* Re-presentment fees are tied to nonsufficient funds (or NSF) transactions, that is, when a bank denies its depositor's attempt to authorize a payment exceeding her available balance. *See Not Sufficient Funds*, Black's Law Dictionary, *supra*, at 1277 ("The notation of dishonor . . . indicating that the drawer's account does not contain enough money to cover payment."). Unlike an overdraft, where a depositor's debit to her account is authorized and paid by the bank despite an absence of funds in her account to cover the transaction, an NSF transaction means the requested payment has been rejected due to such a shortfall.

Flagstar similarly charged a $36 fee for each declined payment. And that fee, too, had the potential to multiply, sometimes rapidly. When a bank denies an NSF transaction, the presenting merchant can "re-present" the returned transaction (i.e., try again to receive payment) in the hopes of receiving money. *See* FDIC, *Supervisory Guidance on Multiple Re-Presentment NSF Fees* 1, https://perma.cc/7LTR-8FXH (Aug. 2022). If the merchant did so, Flagstar would charge an NSF fee for *each* presentment concerning the single denied transaction.

Depositors like Gardner enrolled in the "Bounce Protection Overdraft Privilege Program" could still incur an NSF charge (and, in turn, a re-presentment fee) either because Flagstar exercised its contractual discretion to decline an overdraft (e.g., for an account in bad standing), or because the depositor had exceeded her overdraft limit. As with overdraft fees, Gardner purports to have known the basics of NSF fees when she opened her account. Yet she says she was unaware that re-presentment fees could be incurred in the recurring manner just described, something she only later learned when her account was overdrawn. For example, in December 2019, a leasing company presented a payment of $86.13 to Gardner's account. Because her balance at the time (−$600.93) could not cover the payment, Flagstar rejected it, charging Gardner's account a $36 NSF fee in the process. Over the next two weeks, the leasing company

re-presented that very same transaction twice more, each time causing Flagstar to charge a $36 fee to Gardner's account. All told, Gardner incurred $108 in NSF fees for one transaction costing $86.13 (which, again, was never paid).

B. Unable to resolve these charges with Flagstar, Gardner turned to federal court, filing a putative class action against the bank. She alleged that the bank's handling of APSN transactions and re-presented payments breached the T&C, including the implied covenant of good faith and fair dealing, and converted her funds for personal gain.

Flagstar moved to dismiss the claims. The district court granted the motion as to the conversion claim but denied it for the breach of contract claim, explaining that the T&C did not unambiguously support Flagstar's contractual reading. *Gardner v. Flagstar Bank, FSB (Gardner I)*, No. 20-12061, 2021 WL 3772866, at *6, *8 (E.D. Mich. Aug. 23, 2021). At summary judgment, however, the district court granted judgment to Flagstar on the breach of contract claim. *Gardner v. Flagstar Bank, N.A. (Gardner II)*, No. 20-12061, 2024 WL 1641223, at *12 (E.D. Mich. Apr. 16, 2024). In its view, because portions of Gardner's deposition indicated she did not read the T&C upon signing, she could not advance her own interpretation of the contract. *Id.* at *10. Thus, while reaffirming that key language in the T&C remained ambiguous, the district court granted Flagstar summary judgment. *Id.* (referring to the "ambiguity in the Agreement" regarding APSN fees and "the existing ambiguity regarding" re-presentment fees). Gardner appeals that decision.

## II.

We review a district court's grant of summary judgment de novo, viewing the evidence and drawing all reasonable inferences in favor of the nonmovant—here, Gardner. *See Hall v. Navarre*, 118 F.4th 749, 756 (6th Cir. 2024). Summary judgment is warranted only if "the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see* Fed. R. Civ. P. 56(a).

We also review de novo a district court's interpretation of state law. *Hinman v. ValleyCrest Landscaping Dev., Inc.*, 89 F.4th 572, 574 (6th Cir. 2024). The parties agree that Michigan law governs our reading of the T&C. *See Wesco Ins. Co. v. Roderick Linton Belfance, LLP*, 39 F.4th 326, 335 (6th Cir. 2022).

Michigan courts consider a contract ambiguous when "two provisions of the same contract irreconcilably conflict with each other" or when a provision "is equally susceptible to more than a single meaning." *Kendzierski v. Macomb County*, 931 N.W.2d 604, 612 (Mich. 2019) (quotation marks and citations omitted). If a contract is ambiguous, its interpretation is ordinarily "a question of fact that must be decided by the jury." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453–54 (Mich. 2003) (citation omitted). Even with an ambiguous contract, however, "summary judgment is proper so long as the extrinsic evidence presented to the court supports only one of the conflicting interpretations." *United Rentals (N. Am.), Inc. v. Keizer*, 355 F.3d 399, 406 (6th Cir. 2004) (quotation marks and citation omitted) (applying Michigan contract law).

A. Start with the APSN transactions. Examining the version of the T&C agreed to by Gardner when she opened her account, the district court deemed the agreement ambiguous with respect to whether Flagstar would charge overdraft fees for these transactions. *Gardner I*, 2021 WL 3772866, at *6 ("[T]he instant matter presents ambiguities about when [overdraft fees] may be assessed in [APSN] [t]ransactions under the existing contractual language."); *Gardner II*, 2024 WL 1641223, at *10 (referring to "the ambiguity in the [original] [a]greement" regarding APSN transactions). On appeal, Flagstar does not contest the point.

With all parties now agreeing on the ambiguity of the agreement's APSN language, there seemingly is little left for us to do on this issue, short of remanding the case back to district court. *See, e.g.*, *Madej v. Maiden*, 951 F.3d 364, 374 (6th Cir. 2020) (opting to not address merits of district court holding uncontested on appeal). After all, "[w]here a written contract is ambiguous, a factual question is presented as to the meaning of its provisions, requiring a factual determination as to the intent of the parties in entering the contract." *Klapp*, 663 N.W.2d at 454 (quoting 11 Richard A. Lord, *Williston on Contracts* § 30:7 (4th ed. 1990)). Such factfinding, of course, ordinarily lies in the domain of a district court or jury, not this Court sitting in review of a summary judgment. *Id.*

1. Resisting a return to district court, Flagstar asserts that the conceded textual ambiguity is unimportant because we have looked to the wrong document. Rather than consulting the original T&C—the version in effect at the time Gardner opened her account—Flagstar instead points to a "disclosure guide" update mailed to Gardner in December 2017. (The parties quarrel over the precise date at which this update took legal effect, a debate we need not resolve here.) Summarizing recent and forthcoming changes to the T&C, the disclosure guide added an express clarification that Flagstar would charge overdraft fees for APSN transactions. At least at the point the update issued, that fact seemingly is significant. After all, Gardner largely does not argue that the T&C, as modified, are ambiguous or invalid regarding Flagstar's handling of APSN transactions.

But what about the Leo's Coney Island and McDonald's transactions, both of which occurred before the contractual update? Flagstar believes we should not consider them, primarily for procedural reasons. In her complaint, the bank emphasizes, Gardner references as examples only APSN transactions that occurred after the T&C was updated. The two September 2016 fees,

Flagstar adds, first surfaced in a declaration prepared by a purported expert witness, which was attached to Gardner's summary judgment response brief. That renders the testimony untimely, and thus unable to support Gardner's position, says the bank, because it was submitted "long after the close of plaintiff-specific discovery." Appellee Br. 34.

We agree with Flagstar that district courts enjoy "discretion to refuse the filing of untimely affidavits." *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1446 (6th Cir. 1993); *see generally* Fed. R. Civ. P. 16. But Flagstar never moved to strike the declaration at issue on timeliness grounds. Nor, it bears adding, did the district court refuse Gardner's filing of the expert's declaration; rather, it implicitly honored that testimony when it clarified that its holding applied equally "[t]o the extent that Gardner assert[ed] claims for [APSN] fees charged against her account *before the updated disclosure guide became effective*." *Gardner II*, 2024 WL 1641223, at *10 (emphasis added). That conclusion makes particular sense when, again, Flagstar did not raise a timeliness issue with the district court, instead opting for solely merits-based challenges to the testimony. It is too late to do so now. *Novus Grp., LLC v. Prudential Fin., Inc.*, 74 F.4th 424, 428 (6th Cir. 2023) ("[A]rguments raised for the first time on appeal are forfeited."). Nor can Flagstar challenge the admission of the account statement upon which Gardner's expert testimony is based, as Flagstar itself introduced that very statement. *Cf. United States v. Demmler*, 655 F.3d 451, 459 (6th Cir. 2011).

To the extent Flagstar alleges this testimony does not raise a genuine issue of fact due to it being "inconclusive[]," Appellee Br. 33, we disagree. Citing one of Gardner's account statements, her expert witness pointed out a check that had posted two days before the posting of the at-issue September 2016 transactions. That check triggered an overdraft fee even though Gardner's ledger balance was $35.31 (i.e., positive) after the check's posting. Why? Well, according to the expert

retained by Gardner, Gardner's *available* balance must have been negative at the time of the check, meaning "there had to have been at least $35.32 in pending holds on previously authorized transactions." Olsen Decl., R. 112-6, PageID#2997. And because the Leo's Coney Island and McDonald's transactions were the only charges that posted shortly after the check, Gardner's expert concluded that these transactions were the "likely" culprits—rendering them APSN. *Id.* At this stage of litigation, we ask only whether a "rational" factfinder "could" find for Gardner. *Matsushita*, 475 U.S. at 587. On that score, while not conclusive, this reasonable inference suffices to defeat summary judgment.

2. Echoing a theme in the district court's opinion, Flagstar next argues that, even if the relevant contractual terms are ambiguous, we should nonetheless affirm the award of summary judgment to Flagstar because extrinsic evidence supports only the bank's interpretation. *See United Rentals*, 355 F.3d at 406. Yet Flagstar's extrinsic evidence leaves much to be desired. It largely addresses Flagstar's view that Gardner did not read material provisions of the original T&C upon signing, which, according to the district court and Flagstar, forecloses any argument on her part about the contract's meaning. *Gardner II*, 2024 WL 1641223, at *10. Whether Gardner read the relevant terms, however, makes no difference here.

That is the case because the general practice in Michigan is to deem probative a contracting party's failure to read an agreement only when that party tries to advance an interpretation running counter to the contract's *unambiguous* text. *See, e.g.*, *Komraus Plumbing & Heating, Inc. v. Cadillac Sands Motel, Inc.*, 195 N.W.2d 865, 867–68 (Mich. 1972); *Pritts v. J.I. Case Co.*, 310 N.W.2d 261, 265 (Mich. Ct. App. 1981). While Flagstar reads these decisions in a different light, our best understanding of Michigan law is that this rule is cabined to unambiguous contractual language. *See Nat'l Sur. Corp. v. Hartford Cas. Ins.*, 493 F.3d 752, 755 (6th Cir. 2007) (reciting

how we "resolv[e] an issue of state law in a diversity case" by "mak[ing] [the] best prediction . . . of what the [state high court] would do" (third alteration in original) (quotation marks and citation omitted)).  Nor, it bears adding, does Flagstar cite a compelling basis justifying an extension of this case law to ambiguous contracts, let alone persuasively explain why Michigan courts would do so if given the chance.  Intuition, in fact, suggests otherwise.  The cited cases derive from the principle that "parties who contract in writing are conclusively presumed *to have intended what they have written*." *Komraus*, 195 N.W.2d at 868 (emphasis added); *see also Montgomery v. Fid. & Guar. Life Ins.*, 713 N.W.2d 801, 805 (Mich. Ct. App. 2005) (per curiam) ("A contracting party has a duty to examine a contract *and know what the party has signed . . . .*" (emphasis added) (citing *Komraus*, 195 N.W.2d at 865)).  Yet when the writing, as here, is itself ambiguous, the nonreading party's signature seemingly indicates very little about her subjective understanding of the contract.  *See, e.g.*, *Wells v. ABC Warehouse*, No. 242746, 2004 WL 136389, at *2 (Mich. Ct. App. Jan. 27, 2004) (per curiam) ("*Because the language at issue was clear*, plaintiff cannot seek to disclaim the [signed] contract on the ground that she failed to understand its terms." (emphasis added)); *Fabatz v. Auto-Owners Ins. Co.*, No. 350209, 2020 WL 7413823, at *1, *3 (Mich. Ct. App. Dec. 17, 2020) (per curiam) (determining whether insurance policy was ambiguous after observing that plaintiffs did not read it).

Flagstar also invokes depositions of bank officials as purported extrinsic evidence of its contractual intent.  Flagstar, however, fails to explain how the material supports its position regarding ambiguity.  "Where issues are adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, we consider them forfeited." *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022) (citation modified).

10

Failing on these fronts, Flagstar turns to Gardner's litigation choices, emphasizing her inability to cite extrinsic evidence supporting her position. Yet that flips the burden. Again, summary judgment is appropriate in this setting only when "extrinsic evidence *presented* to the court *supports* only one" side. *United Rentals*, 355 F.3d at 406 (emphasis added) (citation omitted). The absence of countervailing evidence from the nonmovant, without more, does not suffice.

B. Turn now to re-presentment fees. Unlike APSN fees, Flagstar argues here that the applicable text in the T&C unambiguously supports its side. To our minds, however, that text instead "yields to conflicting reasonable interpretations." *Fresard v. Mich. Millers Mut. Ins. Co.*, 327 N.W.2d 286, 293 (Mich. 1982).

Consult, as do Michigan courts, the "plain meaning" of "the words and phrases used by the parties." *Meemic Ins. Co. v. Jones*, 984 N.W.2d 57, 63 (Mich. 2022). At the crux of the disagreement here is the meaning of the term "Item." The T&C provides that NSF fees may be assessed whenever a depositor's available balance is insufficient "to pay an Item." Original T&C, R. 97-1, PageID#1968; Am. T&C, R. 113-5, PageID#3197. The original T&C "intended" "Items . . . to refer to any debits against [the depositor's] account and include, but are not limited to, withdrawal tickets, checks, transfers, electronic debits, imaged debits, wire transfers, ATM debits, ACH debits, bill pay debits, photo copy debits, bank generated debits, and debit card point of sale transactions," as well as both posted and pending transactions. Original T&C, R. 97-1, PageID#1963–64. The amended T&C, for its part, retained much of this definition and added that "'Item' means any order, instruction or authorization to pay, transfer or withdraw funds or money from your account." Am. T&C, R. 113-5, PageID#3193. According to Flagstar, this language, at

least as amended, shows that each presentment constitutes an "Item" and that re-presentment may therefore result in multiple NSF fees for one underlying transaction.

Perhaps. Consider the contract's inclusion of the term "any." Its use generally "asserts concerning a being or thing of the sort named, without limitation as to which, and thus constructively of *every* one of them." *Any*, 1 Oxford English Dictionary 539 (2d ed. 1989); *see also Fremont Ins. v. Izenbaard*, 820 N.W.2d 902, 903 (Mich. 2012) (order) (consulting dictionary definitions to interpret undefined term in contract). This broad term debatably suggests the parties intended each merchant's request for payment to count as individual "Item[s]," even those deriving from the same transaction.

But perhaps not. Implicit in Flagstar's reading is that a merchant can itself "order, instruct[], or authoriz[e]" payment—in this case by re-presenting a transaction. That is not how a bank account normally works. Rather, the *depositor* generally tells his bank to pay the merchant, often through the act of swiping a card. *See Townsel v. DISH Network L.L.C.*, 668 F.3d 967, 968 (7th Cir. 2012) ("Use of a debit card instructs a bank to transfer money to the merchant from a particular checking account."); *DBI Architects, P.C. v. Am. Express Travel-Related Servs. Co.*, 388 F.3d 886, 894 (D.C. Cir. 2004) (referring to "cardholder [who] authorizes its bank to pay its credit card bills automatically each month"); Hal S. Scott, *Corporate Wire Transfers and the Uniform New Payments Code*, 83 Colum. L. Rev. 1664, 1680 (1983) ("The drawer of a pay order is the customer that orders its bank . . . to pay a specified payee."). Context supports the point. *See Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 781 n.11 (Mich. 2003) ("We read contracts as a whole . . . ."). Beyond defining "Item," the T&C states that an NSF fee may be assessed after "an Item is presented to" Flagstar. Original T&C, R. 97-1, PageID#1968; Am. T&C, R. 113-5, PageID#3197. Yet if each presentment itself forms an "Item," this language becomes arguably

redundant. Under Michigan law, we should "avoid an interpretation that would render any part of the contract surplusage." *Klapp*, 663 N.W.2d at 453.

With these considerations in mind, the district court deemed both parties' interpretations reasonable. *See Gardner I*, 2021 WL 3772866, at *8 ("[T]he [T&C's] language in the instant case lends itself to two reasonable interpretations of 'item' . . . ."); *Gardner II*, 2024 WL 1641223, at *10 (discussing "the existing ambiguity regarding Item Presentment Fees"). A host of other district courts have done the same, analyzing similar contractual text using similar principles of interpretation. *E.g.*, *Perks v. TD Bank, N.A.*, 444 F. Supp. 3d 635, 640 (S.D.N.Y. 2020) (deeming "item" ambiguous in a contract stating "[a]n 'item' includes a[n] . . . ACH transaction . . . and any other instruction or order for the payment, transfer, deposit or withdrawal of funds" (omissions and second alteration in original) (emphasis omitted)); *see also Encarnacion v. Workers Credit Union*, No. 21-cv-40077, 2022 WL 16574051, at *3 (D. Mass. Apr. 14, 2022) (collecting cases); *Lewis v. Pendleton Cmty. Bank*, No. 22-CV-12, 2024 WL 897848, at *4 (N.D. W. Va. Mar. 1, 2024) (collecting more cases). Indeed, the case law in this setting feels entirely lopsided. Flagstar's cited cases, by comparison, do not even concern re-presentment fees. *See Boone v. MB Fin. Bank, N.A.*, 375 F. Supp. 3d 987, 992–95 (N.D. Ill. 2019) (analyzing exclusively overdraft fees); *McCollam v. Sunflower Bank, N.A.*, 598 F. Supp. 3d 1104, 1109–13 (D. Colo. 2022) (same); *Brown v. Dep't of Com. Fed. Credit Union*, No. 2021-CA-000554-B, 2021 WL 9476637, at *2–5 (D.C. Super. Ct. Nov. 12, 2021) (order) (same).

In sum, whereas Flagstar could have fairly interpreted the T&C to permit multiple NSF fees for each transaction, Gardner could just have fairly interpreted the T&C to permit just one fee per transaction. That means the T&C's "words may reasonably be understood in different ways," rendering the contract "ambiguous." *Raska v. Farm Bureau Mut. Ins. Co.*, 314 N.W.2d 440, 441

(Mich. 1982). As before, the resolution of that ambiguity raises a factual question generally ill-fitting for summary judgment. *See Klapp*, 663 N.W.2d at 454.

Here too, Flagstar tries to square away the ambiguity by emphasizing Gardner's purported failure to read the T&C and her inability to cite any extrinsic evidence. For the same reasons addressed in our discussion of APSN transactions, those observations alone fall short of justifying summary judgment.

Flagstar also contests our understanding of the district court's holding, asserting that the district court deemed the amended T&C unambiguous regarding the bank's ability to charge re-presentment fees. We acknowledge (as did Flagstar at oral argument) the possible ambiguity in the nature of the district court's "ambiguity" conclusion. But the best reading of that decision is that the district court's use of the term "existing"—in describing "the existing ambiguity regarding Item Presentment Fees," *Gardner II*, 2024 WL 1641223, at *10—referred to the amended T&C. Flagstar's quotation to the district court's explanation of how the bank's contractual changes "clarifie[d]" the use of temporary debit authorization is unavailing, as that clarification pertains only to APSN transactions, not re-presentment fees. *See* Appellee Br. 28 ("Flagstar's updated definition 'clarifies that a transaction which creates a temporary debit authorization hold is an "item" that does not become "posted" to the account until after it is paid from the account.'" (quoting *Gardner II*, 2024 WL 1641223, at *7)).

C. One last point. Recall that Gardner's breach of contract claim also alleges that Flagstar breached the implied covenant of good faith and fair dealing. This covenant, at a high level, describes "a promise that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Kircher v. Boyne USA,*

*Inc.*, --- N.W.3d ----, No. 166459, 2025 WL 938147, at \*3 (Mich. Mar. 27, 2025) (per curiam) (quotation marks and citation omitted).

In Michigan, "there is no independent cause of action for breach of the implied covenant of good faith and fair dealing." *Id.* Accordingly, after the district court determined that Flagstar did not breach the T&C, it necessarily concluded Flagstar likewise did not breach the implied covenant of good faith and fair dealing. *Gardner II*, 2024 WL 1641223, at \*10–11. On appeal, Flagstar defends this conclusion on the same basis, adding that its purported "lack of good faith cannot override an express contract provision." Appellee Br. 47.

Because we deem the T&C ambiguous and potentially breached by Flagstar, it follows that Gardner, as part of her breach of contract claim, can argue the bank breached the implied covenant of good faith and fair dealing. This inference comports with the dispositions of Michigan courts in identical postures. *See, e.g.*, *PTN-NRS, LLC v. County of Wayne*, No. 332135, 2017 WL 4447016, at \*3 (Mich. Ct. App. Oct. 5, 2017) (per curiam) (reversing summary judgment because plaintiff alleged "specific provisions in the parties' contract were breached" and "also sufficiently alleged a breach of contract based upon bad faith or unfair dealing"); *Hall v. El-Bathy*, No. 362063, 2023 WL 3563021, at \*4 (Mich. Ct. App. May 18, 2023) (per curiam) (effectively same).

\*     \*     \*     \*     \*

We reverse and remand for further proceedings.